Justice Breyer
delivered the opinion of the Court.
■ For many years, an Indiana statute, the “Barrett Law,” authorized Indiana’s cities to impose upon benefited lot own *676 .ers the cost of sewer improvement projects. The Barrett Law also permitted those lot owners to pay either immediately in the form of a lump sum or over time in installments. In 2005, the city of Indianapolis (Indianapolis or City) adopted a new assessment and payment method, the “STEP” plan, and it forgave any Barrett Law installments that lot owners had not yet paid.
A group of lot owners who had already paid their entire Barrett Law assessment in a lump sum believe that the City should have provided them with equivalent refunds. And we must decide whether the City’s refusal to do so unconstitutionally discriminates against them in violation of the Equal Protection Clause, Arndt. 14, § 1. We hold that the City had a rational basis for distinguishing between those lot owners who had already paid their share of project costs and those who had not. And we conclude that there is no equal protection violation.
I
A
Beginning in 1889, Indiana’s Barrett Law permitted cities to pay for public improvements, such as sewage projects, by “apportioning]” the costs of a project “equally among all abutting lands or lots.” Ind. Code § 36-9-39-15(b)(3) (2011); see Town Council of New Harmony v. Parker, 726 N. E. 2d 1217, 1227, n. 13 (Ind. 2000) (project’s beneficiaries pay its costs). When a city built a Barrett Law project, the city’s public works board would create an initial lot-owner assessment by “dividing the estimated total cost of the sewage works by the total number of lots.” § 36-9-39-16(a). It might then adjust an individual assessment downward if the lot would benefit less than would others. § 36-9-39-17(b). Upon completion of the project, the board would issue a final lot-by-lot assessment.
The Barrett .Law permitted lot owners to pay the assessment either in a single lump sum or over time in installment *677 payments (with interest). The City would collect installment payments “in the same manner as other taxes.” §36-9-37-6. The Barrett Law authorized 10-, 20-, or 30-year installment plans. § 36-9-37-8.5(a). Until fully paid, an assessment would constitute a lien against the property, permitting the city to initiate foreclosure proceedings in case of a default. §§ 36-9~37-9(b), -22.
For several decades, Indianapolis used the Barrett Law system to fund sewer projects. See, e. g., Conley v. Brummil, 92 Ind. App. 620, 621, 176 N. E. 880, 881 (1931) (in banc). But in 2005, the City adopted a new system, called the Septic Tank Elimination Program (STEP), which financed projects in part through bonds, thereby lowering individual lot owners' sewer-connection costs. By that time, the City had constructed more than 40 Barrett Law projects. App. to Pet. for Cert. 5a. We are told that installment-paying lot owners still owed money in respect to 24 of those projects. See Reply Brief for Petitioners 16-17, n. 3 (citing City’s Response to Plaintiff’s Brief on Damages, Record in Cox v. Indianapolis, No. 1:09-cv-0435 (SD Ind.), Doc. 98-1 (Exh. A)). In respect to 21 of the 24, some installment payments had not yet fallen due; in respect to the other 3, those who owed money were in default. Reply Brief for Petitioners 17, n. 3.
B
This case concerns one of the 24 still-open Barrett Law projects, namely, the Brisbane/Manning Sanitary Sewers Project. The Brisbane/Manning Project began in 2001. It connected about 180 homes to the City’s sewage system. Construction was completed in 2003. The Indianapolis Board of Public Works (Board) held an assessment hearing in June 2004. And in July 2004, the Board sent the 180 affected homeowners a formal notice of their payment obligations.
The notice made clear that each homeowner could pay the entire assessment — $9,278 per property — in a lump sum or *678 in installments, which would include interest at a 3.5% annual rate. Under an installment plan, payments would amount to $77.27 per month for 10 years; $38.66 per month for 20 years; or $25.77 per month for 30 years. In the event, 38 homeowners chose to pay up front; 47 chose the 10-year plan; 27 chose the 20-year plan; and 68 chose the 30-year plan. And in the first year each homeowner paid the amount due ($9,278 upfront; $927.80 under the 10-year plan; $463.90 under the 20-year plan, or $309.27 under the 30-year plan). App. to Pet. for Cert. 48a.
The next year, however, the City decided to abandon the Barrett Law method of financing. It thought that the Barrett Law’s lot-by-lot payments had become too burdensome for many homeowners to pay, discouraging changes from less healthy septic- tanks to healthier sewer systems. See id., at 4a-5a. (For example, homes helped by the Brisbane/ Manning Project, at a cost of more than $9,000 each, were then valued at $120,000 to $270,000. App. 67.) The City’s new STEP method of financing would charge each connecting lot owner a flat $2,500 fee and make up the difference by floating bonds eventually paid for by all lot owners citywide. See App. to Pet. for Cert. 5a, n. 5.
On October 31, 2005, the City enacted an ordinance implementing its decision. In December, the Board enacted a further resolution, Resolution 101, which, as part of the transition, would “forgive all assessment amounts ... established pursuant to the Barrett Law Funding for Municipal Sewer programs due and owing from the date of November 1, 2005 forward.” App. 72 (emphasis added). In its preamble, the resolution said that the Barrett Law “may present financial hardships on many middle to lower income participants who most need sanitary sewer service in lieu of failing septic systems”; it pointed out that the City was transitioning to the new STEP method of financing; and it said that the STEP method was based upon a financial model that had “considered the current assessments being made by participants in *679 active Barrett Law projects” as well as future projects. Id., at 71-72. The upshot was that those who still owed Barrett Law assessments would not have to make further payments but those who had already paid their assessments would not receive refunds. This meant that homeowners who had paid the full $9,278 Brisbane/Manning Project assessment in a lump sum the preceding year would receive no refund, while homeowners who had elected to pay the assessment in installments, and had paid a total of $309.27, $463.90, or $927.80, would be under no obligation to make further payments.
In February 2006, the 38 homeowners who had paid the full Brisbane/Manning Project assessment asked the City for a partial refund (in an amount equal to the smallest forgiven Brisbane/Manning installment debt, apparently $8,062). The City denied the request in part because “ [refunding payments made in your project area, or any portion of the payments, would establish a precedent of unfair and inequitable treatment to all other property owners who have also paid Barrett Law assessments . . . and while [the November 1, 2005, cutoff date] might seem arbitrary to you, it is essential for the City to establish this date and move forward with the new funding approach.” Id., at 50-51.
C
Thirty-one of the thirty-eight Brisbane/Manning-Project lump-sum homeowners brought this lawsuit in Indiana state court seeking a refund of about $8,000 each. They claimed in relevant part that the City’s refusal to provide them with refunds at the same time that the City forgave the outstanding project debts of other Brisbane/Manning homeowners violated the Federal Constitution’s Equal Protection Clause, Arndt. 14, §1; see also Rev. Stat. §1979, 42 U. S. C. § 1983. The trial court granted summary judgment in their favor. The State Court of Appeals affirmed that judgment. 918 N. E. 2d 401 (2009). But the Indiana *680 Supreme Court reversed. 946 N. E. 2d 553 (2011). In its view, the City’s distinction between those who had already paid their Barrett Law assessments and those who had not was “rationally related to its legitimate interests in reducing its administrative costs, providing relief for property owners experiencing financial hardship, establishing a clear transition from [the] Barrett Law to STEP, and preserving its limited resources.” App. to Pet. for Cert. 19a. We granted certiorari to consider the equal protection question. And we now affirm the Indiana Supreme Court.
II
A
As long as the City’s distinction has a rational basis, that distinction does not violate the Equal Protection Clause. This Court has long held that “a classification neither involving fundamental rights nor proceeding along suspect lines . . . cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose.” Heller v. Doe, 509 U. S. 312, 319-320 (1993); cf. Gulf, C. & S. F. R. Co. v. Ellis, 165 U. S. 150, 155, 165-166 (1897). We have made clear in analogous contexts that, where “ordinary commercial transactions” are at issue, rational basis review requires deference to reasonable underlying legislative judgments. United States v. Carotene Products Co., 304 U. S. 144, 152 (1938) (due process); see also New Orleans v. Dukes, 427 U. S. 297, 303 (1976) (per curiam) (equal protection). And we have repeatedly pointed out that “[legislatures have especially broad latitude in creating classifications and distinctions in tax statutes.” Regan v. Taxation With Representation of Wash., 461 U. S. 540, 547 (1983); see also Fitzgerald v. Racing Assn, of Central Iowa, 539 U. S. 103, 107-108 (2003); Nordlinger v. Hahn, 505 U. S. 1, 11 (1992); Lehnhausen v. Lake Shore Auto Parts Co., 410 U. S. 356, 359 (1973); Madden v. Kentucky, 309 U. S. 83, 87-88 (1940); *681 Citizens’ Telephone Co. of Grand Rapids v. Fuller, 229 U. S. 322, 329 (1913).
Indianapolis’ classification involves neither a “fundamental right” nor a “suspect” classification. Its subject matter is local, economic, social, and commercial. It is a tax classification. And no one here claims that Indianapolis.has discriminated against out-of-state commerce or new residents. Cf. Hooper v. Bernalillo County Assessor, 472 U. S. 612 (1985); Williams v. Vermont, 472 U. S. 14 (1985); Metropolitan Life Ins. Co. v. Ward, 470 U. S. 869 (1985); Zobel v. Williams, 457 U. S. 55 (1982). Hence, this case falls directly within the scope of our precedents holding such a law constitutionally valid if “there is a plausible policy reason for the classification, the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational.” Nordlinger, supra, at 11 (citations omitted). And it falls within the scope of our precedents holding that there is such a plausible reason if “there is any reasonably conceivable state of facts that could provide a rational basis for the classification.” FCC v. Beach Communications, Inc., 508 U. S. 307, 313 (1993); see also Lindsley v. Natural Carbonic Gas Co., 220 U. S. 61, 78 (1911).
Moreover, analogous precedent warns us that we are not to “pronoune[e]” this classification “unconstitutional unless in the light of the facts made known or generally assumed it is of such a character as to preclude the assumption that it rests upon some rational basis within the knowledge and experience of the legislators.” Carotene Products Co., supra, at 152 (due process claim). Further, because the classification is presumed constitutional, the “ ‘burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it.’” Heller, supra, at 320 (quoting Lehnhausen, supra, at 364).
*682 B
In our view, Indianapolis’ classification has a rational basis. Ordinarily, administrative considerations can justify a tax-related distinction. See, e. g., Carmichael v. Southern Coal & Coke Co., 301 U. S. 495, 511-512 (1937) (tax exemption for businesses with fewer than eight employees rational in light of the “ [administrative convenience and expense” involved); see also Lehnhausen, supra, at 365 (comparing administrative cost of taxing corporations versus individuals); Madden, supra, at 90 (comparing administrative cost of taxing deposits in local banks versus those elsewhere). And the City’s decision to stop collecting outstanding Barrett Law debts finds rational support in related administrative concerns.
The City had decided to switch to the STEP system. After that change, to continue Barrett Law unpaid-debt collection could have proved complex and expensive. It would have meant maintaining an administrative system that for years to come would have had to collect debts arising out of 20-plus different construction projects built over the course of a decade, involving monthly payments as low as $25 per household, with the possible need to maintain credibility by tracking down defaulting debtors and bringing legal action. The City, for example, would have had to maintain its Barrett Law operation within the City Controller’s Office, keep files on old, small, installment-plan debts, and (a City official says) possibly spend hundreds of thousands of dollars keeping computerized debt-tracking systems current. See Brief for International City/County Management Association et al. as Amici Curiae 13, n. 12 (citing Affidavit of Charles White ¶13, Record in Cox, Doc. No. 57-3). Unlike the collection system prior to abandonment, the City would not have added any new Barrett Law installment-plan debtors. And that fact means that it would have had to spread the fixed administrative costs of collection over an ever-declining number of debtors,, thereby continuously increasing the per-debtor cost of collection.
*683 Consistent with these facts, the director of the City’s Department of Public Works later explained that the City decided to forgive outstanding debt in part because “[t]he administrative costs to service and process remaining balances on Barrett Law accounts long past the transition to the STEP program would hot benefit the taxpayers” and would defeat the purpose of the transition. App. 76. The four other members of the Board have said the same. See Affidavit of Gregory Taylor ¶6, Record in Cox, Doc. No. 57-5; Affidavit of Kipper Tew ¶6, ibid., Doc. No. 57-6; Affidavit of Susan Schalk ¶6, ibid., Doc. No. 57-7; Affidavit of Roger Brown ¶6, ibid., Doc. No. 57-8.
The rationality of the City’s distinction draws further support from the nature of the line-drawing choices that confronted it. To have added refunds to forgiveness would have meant adding yet further administrative costs, namely, the cost of processing refunds. At the same time, to have tried to limit the City’s costs and lost revenues by limiting forgiveness (or refund) rules to Brisbane/Manning homeowners alone would have led those involved in other Barrett Law projects to have justifiably complained about unfairness. Yet to have granted refunds (as well as providing forgiveness) to all those involved in all Barrett Law projects (there were more than 40 projects) or in all open projects (there were more than 20) would have involved even greater administrative burden. The City could not just “cut . . . checks,” post, at 691 (Roberts, C. J., dissenting), without taking funding from other programs or finding additional revenue. If, instead, the City had tried to keep the amount of revenue it lost constant (a rational goal) but spread it evenly among the apparently thousands of homeowners involved in any of the Barrett Law projects, the result would have been yet smaller individual payments, even more likely to have been too small to justify the administrative expense.
Finally, the rationality of the distinction draws support from the fact that the line that the City drew — distinguish *684 ing past payments from future obligations — is a line well known to the law. Sometimes such a line takes the form of an amnesty program, involving, say, mortgage payments, taxes, or parking tickets. E. g., 26 U. S. C. § 108(a) (1)(E) (2006 ed., Supp. IV) (federal income tax provision allowing homeowners to omit from gross income newly forgiven home mortgage debt); United States v. Martin, 523 F.. 3d 281, 284 (CA4 2008) (tax amnesty program whereby State newly forgave penalties and liabilities if taxpayer satisfied debt); Horn v. Chicago, 860 F. 2d 700, 704, n. 9 (CA7 1988) (city parking ticket amnesty program whereby outstanding tickets could be' newly settled for a fraction of amount specified). This kind of line is consistent with the distinction that the law often makes between actions previously taken and those yet to come.
C
Petitioners’ contrary arguments are not sufficient to change our conclusion. Petitioners point out that the Indiana Supreme Court also listed a different consideration, namely, “financial hardship,” as one of the factors supporting rationality. App. to Pet. for Cert. 19a. They refer to the City’s resolution that said that, the Barrett Law “may present financial hardships on many middle to lower income participants who most need sanitary sewer service in lieu of failing septic systems.” App. 71. And they argue that the tax distinction before us would not necessarily favor low-income homeowners.
We need not consider this argument, however, for the administrative considerations we have mentioned are sufficient to show a rational basis for the City’s distinction. The Indiana Supreme Court wrote that the City’s classification was “rationally related” in part “to its legitimate interests in reducing its administrative costs.” App. to Pet. for Cert. 19a (emphasis added). The record of the City’s proceedings is consistent with that determination. See App. 72 (when de *685 veloping transition, the City “considered the current assessments being made by participants in active Barrett Law projects”)- In any event, a legislature need not “actually articulate at any time the purpose or rationale supporting its classification.” Nordlinger, 505 U. S., at 15; see also Fitzgerald, 539 U. S., at 108 (similar). Rather, the “burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it.” Madden, 309 U. S., at 88; see Heller, 509 U. S., at 320 (same); Lehnhausen, 410 U. S., at 364 (same); see also Allied Stores of Ohio, Inc. v. Bowers, 358 U. S. 522, 530 (1959) (upholding state tax classification resting “upon a state of facts that reasonably can be conceived” as creating a rational distinction). Petitioners have not “negative[dj” the Indiana Supreme Court’s first listed justification, namely, the administrative concerns we have discussed.
Petitioners go on to propose various other forgiveness systems that would have included refunds for at least some of those who had already paid in full. They argue that those systems are superior to the system that the City chose. We have discussed those, and other possible, systems earlier. Supra, at 682-683. Each has advantages and disadvantages. But even if petitioners have found a superior system, the Constitution does not require the City to draw the perfect line nor even to draw a line superior to some other line it might have drawn. It requires only that the line actually drawn be a rational line. And for the reasons we have set forth in Part II-B, supra, we believe that the line the City drew here is rational.
Petitioners further argue that administrative considerations alone should not justify a tax distinction, lest a city arbitrarily allocate taxes among a few citizens while forgiving many similarly situated citizens on the ground that it is cheaper and easier to collect taxes from a few people than from many. Brief for Petitioners 45. Petitioners are right that administrative considerations could not justify such an *686 unfair system. But that is not because administrative considerations can never justify tax differences (any more than they can always do so). The question is whether reducing those expenses, in the particular circumstances, provides a rational basis justifying the tax difference in question.
In this case, “in the light of the facts made known or generally assumed,” Carotene Products Co., 304 U. S., at 152, it is reasonable to believe that to graft a refund system onto the City’s forgiveness decision could have (for example) imposed an administrative burden of both collecting and paying out small sums (say, $25 per month) for years. As we have said, supra, at 682-684, it is rational for the City to draw a line that avoids that burden. Petitioners, who are the ones “attacking the legislative arrangement,” have the burden of showing that the circumstances are otherwise, i. e., that the administrative burden is too insubstantial to justify the classification. That they have not done.
Finally, petitioners point to precedent that in their view makes it more difficult than we have said for the City to show a “rational basis.” With but one exception, however, the cases to which they refer involve discrimination based on residence or length of residence. E. g., Hooper v. Bernalillo County Assessor, 472 U. S. 612 (state tax preference distinguishing between long-term and short-term resident veterans); Williams v. Vermont, 472 U. S. 14 (state use tax that burdened out-of-state car buyers who moved in state); Metropolitan Life Ins. Co. v. Ward, 470 U. S. 869 (state law that taxed out-of-state insurance companies at a higher rate than in-state companies); Zobel v. Williams, 457 U. S. 55 (state dividend, distribution system that favored long-term residents). But those circumstances are not present here.
The exception consists of Allegheny Pittsburgh Coal Co. v. Commission of Webster Cty., 488 U. S. 336 (1989). The Court there took into account a State Constitution and related laws that required equal valuation of equally valuable *687 property. Id., at 345. It considered the constitutionality of a county tax assessor’s practice (over a period of many years) of determining property values as of the time of the property’s last sale; that practice meant highly unequal valuations for two identical properties that were sold years or decades apart. Id., at 341. The Court first found that the assessor’s practice was not rationally related to the county’s avowed purpose of assessing properties equally at true current value because of the intentional systemic discrepancies the practice created. Id., at 343-344. The Court then noted that, in light of the State Constitution and related laws requiring equal valuation, there could be no other rational basis for the practice. Id., at 344-345. Therefore, the Court held, the assessor’s discriminatory policy violated the Federal Constitution’s insistence upon “equal protection of the law.” Id., at 346.
Petitioners argue that the City’s refusal to add refunds to its forgiveness decision is similar, for it constitutes a refusal to apply “equally” an Indiana state law that says that the costs of a Barrett Law project shall be equally “apportioned.” Ind. Code § 36-9-39-15(b)(3). In other words, petitioners say that even if the City’s decision might otherwise be related to a rational purpose, state law (as in Allegheny) makes this the rare case where the facts preclude any rational basis for the City’s decision other than to comply with the state mandate of equality.
Allegheny, however, involved a clear state-law requirement clearly and dramatically violated. Indeed, we have described Allegheny as “the rare case where the facts precluded” any alternative reading of state law and thus any alternative rational basis. Nordlinger, supra, at 16. Here, the City followed state law by apportioning the cost of its Barrett Law projects equally. State law says nothing about forgiveness, how to design a forgiveness program, or whether or when rational distinctions in doing so are permitted. To adopt petitioners’ view would risk transforming *688 ordinary violations of ordinary state tax law into violations of the Federal Constitution.
* * *
For these reasons, we conclude that the City has not violated the Federal Equal Protection Clause. And the Indiana Supreme Court’s similar judgment is

Affirmed.