Justice THOMAS, dissenting.
I join Justice SCALIA's dissent. I write separately to explain why the Court's resolution of the jurisdictional question, ante, at 739 - 744, lacks any foundation in the Constitution's text or our historical traditions. We have jurisdiction under 28 U.S.C. § 1257 only if the Louisiana Supreme *745 Court's decision implicates a federal right. That condition is satisfied, the Court holds, because the Constitution purportedly requires state and federal postconviction courts to give "retroactive effect" to new substantive constitutional rules by applying them to overturn long-final convictions and sentences. Ante, at 729. Because our Constitution and traditions embrace no such right, I respectfully dissent.
I
"[O]ur jurisprudence concerning the 'retroactivity' of 'new rules' of constitutional law is primarily concerned, not with the question whether a constitutional violation occurred, but with the availability or nonavailability of remedies." Danforth v. Minnesota, 552 U.S. 264, 290-291, 128 S.Ct. 1029, 169 L.Ed.2d 859 (2008). Accordingly, the issue in this case is not whether prisoners who received mandatory life-without-parole sentences for crimes they committed decades ago as juveniles had an Eighth Amendment right not to receive such a sentence. Rather, the question is how, when, and in what forum that newfound right can be enforced. See ibid.
The Court answers that question one way: It says that state postconviction and federal habeas courts are constitutionally required to supply a remedy because a sentence or conviction predicated upon an unconstitutional law is a legal ity. See ante, at 729 - 733. But nothing in the Constitution's text or in our constitutional tradition provides such a right to a remedy on collateral review.
A
No provision of the Constitution supports the Court's holding. The Court invokes only the Supremacy Clause, asserting that the Clause deprives state and federal postconviction courts alike of power to leave an unconstitutional sentence in place. Ante, at 731 - 732. But that leaves the question of what provision of the Constitution supplies that underlying prohibition.
The Supremacy Clause does not do so. That Clause merely supplies a rule of decision: If a federal constitutional right exists, that right supersedes any contrary provisions of state law. See Art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding"). Accordingly, as we reaffirmed just last Term, the Supremacy Clause is no independent font of substantive rights. Armstrong v. Exceptional Child Center, Inc., 575 U.S. ----, ----, 135 S.Ct. 1378, 1383, 191 L.Ed.2d 471 (2015).
Nor am I aware of any other provision in the Constitution that would support the Court's new constitutional right to retroactivity. Of the natural places to look-Article III, the Due Process Clauses of the Fifth and Fourteenth Amendments, and the Equal Protection Clause of the Fourteenth Amendment-none establishes a right to void an unconstitutional sentence that has long been final.
To begin, Article III does not contain the requirement that the Court announces today. Article III vests "[t]he judicial Power" in this Court and whatever inferior courts Congress creates, Art. III, § 1, and "extend[s]" that power to various "Cases ... and Controversies," Art. III, § 2. Article III thus defines the scope of federal judicial power. It cannot compel state postconviction courts to apply new substantive rules retroactively.
*746 Even if the Court's holding were limited to federal courts, Article III would not justify it. The nature of "judicial power" may constrain the retroactivity rules that Article III courts can apply.* But even our broad modern precedents treat Article III as requiring courts to apply new rules only on direct review. Thus in Griffith v. Kentucky, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), the Court suggested-based on Justice Harlan's views-that "after we have decided a new rule in the case selected, the integrity of judicial review requires that we apply that rule to all similar cases pending on direct review." Id., at 322-323, 107 S.Ct. 708. But, as Justice Harlan had explained, that view of Article III has no force on collateral review: "While the entire theoretical underpinnings of judicial review and constitutional supremacy dictate that federal courts having jurisdiction on direct review adjudicate every issue of law ... fairly implicated by the trial process below and properly presented on appeal, federal courts have never had a similar obligation on habeas corpus." Mackey v. United States, 401 U.S. 667, 682, 91 S.Ct. 1160, 28 L.Ed.2d 404 (1971) (opinion concurring in judgment in part and dissenting in part).
The Court's holding also cannot be grounded in the Due Process Clause's prohibition on "depriv[ations] ... of life, liberty, or property, without due process of law." Amdts. V and XIV, § 1. Quite possibly, " '[d]ue process of law' was originally used as a shorthand expression for governmental proceedings according to the 'law of the land' as it existed at the time of those proceedings ." In re Winship, 397 U.S. 358, 378, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (Black, J., dissenting) (emphasis added); accord, Johnson v. United States, 576 U.S. ----, ----, 135 S.Ct. 2551, 2572-2573, 192 L.Ed.2d 569 (2015) (THOMAS, J., concurring in judgment). Under that understanding, due process excluded any right to have new substantive rules apply retroactively.
Even if due process required courts to anticipate this Court's new substantive rules, it would not compel courts to revisit settled convictions or sentences on collateral review. We have never understood due process to require further proceedings once a trial ends. The Clause "does not establish any right to an appeal ... and certainly does not establish any right to collaterally attack a final judgment of conviction." United States v. MacCollom, 426 U.S. 317, 323, 96 S.Ct. 2086, 48 L.Ed.2d 666 (1976) (plurality opinion); see Pennsylvania v. Finley, 481 U.S. 551, 557, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987) ("States have no obligation to provide [postconviction] relief"). Because the Constitution does not require postconviction remedies, it certainly does not require postconviction courts to revisit every potential type of error. Cf. Martinez v. Court of Appeal of Cal., Fourth Appellate Dist., 528 U.S. 152, 165-166, 120 S.Ct. 684, 145 L.Ed.2d 597 (2000) (SCALIA, J., concurring in judgment) ("Since a State could ... subject its trial-court determinations to no review whatever, it could a fortiori subject them to review which consists of a nonadversarial reexamination of convictions by a panel of government experts").
Nor can the Equal Protection Clause justify requiring courts on collateral review to apply new substantive rules retroactively. That Clause prohibits a State *747 from "deny[ing] to any person within its jurisdiction the equal protection of the laws." Amdt. XIV, § 1. But under our precedents "a classification neither involving fundamental rights nor proceeding along suspect lines ... cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." Armour v. Indianapolis, 566 U.S. ----, ----, 132 S.Ct. 2073, 2080, 182 L.Ed.2d 998 (2012) (internal quotation marks omitted; ellipsis in original).
The disparity the Court eliminates today-between prisoners whose cases were on direct review when this Court announced a new substantive constitutional rule, and those whose convictions had already become final-is one we have long considered rational. "[T]he notion that different standards should apply on direct and collateral review runs throughout our recent habeas jurisprudence." Wright v. West, 505 U.S. 277, 292, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992) ; see Brecht v. Abrahamson, 507 U.S. 619, 633-635, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). Thus, our precedents recognize a right to counsel on direct review, but not in collateral proceedings. Compare Douglas v. California, 372 U.S. 353, 355-358, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963) (courts must provide counsel on an initial direct appeal), with Finley, supra, at 555, 107 S.Ct. 1990 (no such right on habeas). The Fourth Amendment also applies differently on direct and collateral review. Compare Mapp v. Ohio, 367 U.S. 643, 654-660, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (courts on direct review must exclude evidence obtained in violation of the Fourth Amendment), with Stone v. Powell, 428 U.S. 465, 489-496, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976) (no relitigation of such claims on collateral review).
These distinctions are reasonable. They reflect the "significant costs" of collateral review, including disruption of "the State's significant interest in repose for concluded litigation." Wright, supra, at 293, 112 S.Ct. 2482 (internal quotation marks omitted). Our equal protection precedents, therefore, do not compel a uniform rule of retroactivity in direct and collateral proceedings for new substantive constitutional rules.
B
The Court's new constitutional right also finds no basis in the history of state and federal postconviction proceedings. Throughout our history, postconviction relief for alleged constitutional defects in a conviction or sentence was available as a matter of legislative grace, not constitutional command.
The Constitution mentions habeas relief only in the Suspension Clause, which specifies that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." Art. I, § 9, cl. 2. But that Clause does not specify the scope of the writ. And the First Congress, in prescribing federal habeas jurisdiction in the 1789 Judiciary Act, understood its scope to reflect "the black-letter principle of the common law that the writ was simply not available at all to one convicted of crime by a court of competent jurisdiction." Bator, Finality in Criminal Law and Federal Habeas Corpus for State Prisoners, 76 Harv. L. Rev. 441, 466 (1963). Early cases echoed that understanding. E.g., Ex parte Watkins, 3 Pet. 193, 202, 7 L.Ed. 650 (1830) ("An imprisonment under a judgment cannot be unlawful, unless that judgment be an absolute ity; and it is not a ity if the court has general jurisdiction of the subject, although it should be erroneous").
For nearly a century thereafter, this Court understood the Judiciary Act and *748 successor provisions as limiting habeas relief to instances where the court that rendered the judgment lacked jurisdiction over the general category of offense or the person of the prisoner. See Wright, supra, at 285, 112 S.Ct. 2482 (recounting history). Federal habeas courts thus afforded no remedy for a claim that a sentence or conviction was predicated on an unconstitutional law. Nor did States. Indeed, until 1836, Vermont made no provision for any state habeas proceedings. See Oaks, Habeas Corpus in the States 1776-1865, 32 U. Chi. L. Rev. 243, 250 (1965). Even when States allowed collateral attacks in state court, review was unavailable if the judgment of conviction was rendered by a court with general jurisdiction over the subject matter and the defendant. Id., at 261-262.
The Court portrays Ex parte Siebold, 100 U.S. 371, 25 L.Ed. 717 (1880), as a departure from this history and as the genesis of a constitutional principle that "a conviction obtained under an unconstitutional law warrants habeas relief." Ante, at 731. But Siebold -a case construing the scope of federal habeas review under the 1789 Judiciary Act-does not support the Court's position. Ante, at 740 - 744 (SCALIA, J., dissenting). Siebold did not imply that the Constitution requires courts to stop enforcing convictions under an unconstitutional law. Rather, Siebold assumed that prisoners would lack a remedy if the federal habeas statute did not allow challenges to such convictions. 100 U.S., at 377 ("It is true, if no writ of error lies, the judgment may be final, in the sense that there may be no means of reversing it").
Moreover, when Congress authorized appeals as a matter of right in federal criminal cases, the Court renounced Siebold and stopped entertaining federal habeas challenges to the constitutionality of the statute under which a defendant was sentenced or convicted. See Bator, supra, at 473-474, and n. 77. If the Constitution prevented courts from enforcing a void conviction or sentence even after the conviction is final, this Court would have been incapable of withdrawing relief.
The Court's purported constitutional right to retroactivity on collateral review has no grounding even in our modern precedents. In the 1950's, this Court began recognizing many new constitutional rights in criminal proceedings. Even then, however, the Court did not perceive any constitutional right for prisoners to vacate their convictions or sentences on collateral review based on the Court's new interpretations of the Constitution. To the contrary, the Court derived Miranda warnings and the exclusionary rule from the Constitution, yet drew the line at creating a constitutional right to retroactivity. E.g., Linkletter v. Walker, 381 U.S. 618, 629, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965) ("[T]he Constitution neither prohibits nor requires retrospective effect. As Justice Cardozo said, 'We think the Federal Constitution has no voice upon the subject' ").
Only in 1987, in Griffith v. Kentucky, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649, did this Court change course and hold that the Constitution requires courts to give constitutional rights some retroactive effect. Even then, Griffith was a directive only to courts on direct review. It held that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final." Id ., at 328, 107 S.Ct. 708. It said nothing about what happens once a case becomes final. That was resolved in Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) -which announced the narrow exceptions to the rule against retroactivity on collateral review-but which did so by *749 interpreting the scope of the federal habeas writ, not the Constitution.
II
A
Not only does the Court's novel constitutional right lack any constitutional foundation; the reasoning the Court uses to construct this right lacks any logical stopping point. If, as the Court supposes, the Constitution bars courts from insisting that prisoners remain in prison when their convictions or sentences are later deemed unconstitutional, why can courts let stand a judgment that wrongly decided any constitutional question?
The Court confronted this question when Siebold and other cases began expanding the federal habeas statute to encompass claims that a sentence or conviction was constitutionally void. But the Court could not find a satisfactory answer: "A judgment may be erroneous and not void, and it may be erroneous because it is void. The distinctions ... are very nice, and they may fall under the one class or the other as they are regarded for different purposes." Ex parte Lange, 18 Wall. 163, 175-176, 21 L.Ed. 872 (1874).
The lack of any limiting principle became apparent as the Court construed the federal habeas statute to supply jurisdiction to address prerequisites to a valid sentence or conviction (like an indictment). See Bator, 76 Harv. L. Rev., at 467-468, and n. 56, 471. As Justice Bradley, Siebold 's author, later observed for the Court: "It is difficult to see why a conviction and punishment under an unconstitutional law is more violative of a person's constitutional rights, than an unconstitutional conviction and punishment under a valid law." In re Nielsen, 131 U.S. 176, 183, 9 S.Ct. 672, 33 L.Ed. 118 (1889).
I doubt that today's rule will fare any better. By refashioning Siebold as the foundation of a purported constitutional right, the Court transforms an unworkable doctrine into an immutable command. Because Justice Bradley's dicta in Siebold was a gloss on the 1789 Judiciary Act, Congress could at least supply a fix to it. But the Court's reinvention of Siebold as a constitutional imperative eliminates any room for legislative adjustment.
B
There is one silver lining to today's ruling: States still have a way to mitigate its impact on their court systems. As the Court explains, States must enforce a constitutional right to remedies on collateral review only if such proceedings are "open to a claim controlled by federal law." Ante, at 731. State courts, on collateral review, thus must provide remedies for claims under Miller v. Alabama, 567 U.S. ----, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), only if those courts are open to "claims that a decision of this Court has rendered certain sentences illegal ... under the Eighth Amendment." See ante, at 732.
Unlike the rule the Court announces today, this limitation at least reflects a constitutional principle. Only when state courts have chosen to entertain a federal claim can the Supremacy Clause conceivably command a state court to apply federal law. As we explained last Term, private parties have no "constitutional ... right to enforce federal laws against the States." Armstrong, 575 U.S., at ----, 135 S.Ct., at 1383. Instead, the Constitution leaves the initial choice to entertain federal claims up to state courts, which are "tribunals over which the government of the Union has no adequate control, and which may be closed to any claim asserted under a law of the United States." Osborn v. Bank of United *750 States, 9 Wheat. 738, 821, 6 L.Ed. 204 (1824).
States therefore have a modest path to lessen the burdens that today's decision will inflict on their courts. States can stop entertaining claims alleging that this Court's Eighth Amendment decisions invalidated a sentence, and leave federal habeas courts to shoulder the burden of adjudicating such claims in the first instance. Whatever the desirability of that choice, it is one the Constitution allows States to make.
* * *
Today's decision repudiates established principles of finality. It finds no support in the Constitution's text, and cannot be reconciled with our Nation's tradition of considering the availability of postconviction remedies a matter about which the Constitution has nothing to say. I respectfully dissent.

The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Timber & Lumber Co., 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

For instance, Article III courts cannot arrive at a holding, refuse to apply it to the case at hand, and limit its application to future cases involving yet-to-occur events. The power to rule prospectively in this way is a quintessentially legislative power. See Harper v. Virginia Dept. of Taxation, 509 U.S. 86, 106-110, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993) (SCALIA, J., concurring).