Sykes, Circuit Judge, dissenting.
I respectfully dissent. Unlike my colleagues, I think this is indeed the "rare case" in which a state-law uniformity mandate removes otherwise plausible policy justifications for a local legislative classification, leaving no rational basis for the local rule. Nordlinger v. Hahn , 505 U.S. 1, 16, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992) (describing Allegheny Pittsburgh Coal Co. v. Cty. Comm'n of Webster Cty., W. Va. , 488 U.S. 336, 109 S.Ct. 633, 102 L.Ed.2d 688 (1989) ). I would reverse and remand for entry of judgment for the plaintiff.
* * *
To understand this unusual equal-protection claim, it's helpful to review the relevant state legal history. In 1962 the Wisconsin Supreme Court held that the state constitution prohibited the expenditure of public funds to transport children to parochial and private schools. State ex rel. Reynolds v. Nusbaum , 17 Wis.2d 148, 115 N.W.2d 761, 769-70 (1962). Wisconsin voters responded by amending the constitution. In 1967 they added this language: "Transportation of school children . Nothing in this constitution shall prohibit the legislature from providing for the safety and welfare of children by providing for the transportation of children to and from any parochial or private school or institution of learning." WIS. CONST. art. I, § 23.
Acting on this new constitutional authority, the Wisconsin legislature immediately "elect[ed] to provide for the transportation of children to any parochial or private school by amending the existing statutes ... to provide for transportation for students attending private or parochial schools and public schools upon a reasonably uniform basis ." Cartwright v. Sharpe , 40 Wis.2d 494, 162 N.W.2d 5, 8 (1968) (emphasis added). The enabling legislation included an explicit statement of statutory purpose: "The intent of this act is to provide for the safety and welfare of children by providing for their transportation to and from public and private schools." Ch. 68, § 1, 1967 Wis. Sess. Laws 144.
To that end, the legislature amended the school-transportation statutes to require "every school board" to provide transportation to and from public and private schools for all students who reside in the district and live "2 miles or more" from their school. WIS. STAT. § 121.54(2)(a), (b) (mandating public and private school transportation on these terms). So school districts have a statutory duty to provide *1017 free transportation to and from school for all resident children who live two miles or more from their school, whether public or private.
School districts may of course provide more generous transportation service. The statutory scheme recognizes that school boards may elect to transport "all or some of the pupils" who reside in the district and live less than two miles from their school. Id. § 121.54(2)(c). If they choose to do so, however, they may not use different distance standards for public and private school students: "If transportation is provided for less than all such pupils[,] there shall be reasonable uniformity in the minimum distance that pupils attending public and private schools will be transported." Id. The uniformity requirement is repeated in the subsection governing transportation to summer classes. School districts are permitted (but not required) to bus children to summer school, but "[i]f the school board provides transportation for less than all pupils, there shall be reasonable uniformity in the minimum and maximum distances pupils are transported." Id. § 121.54(4).
Finally, and most relevant here, the transportation mandate excludes children who live in cities served by public transit systems. Id. § 121.54(1)(c). Under the so-called "city option," school districts in cities with public transit service are not required to provide free student transportation. If they choose to do so, however, "there shall be reasonable uniformity in the transportation furnished to the pupils, whether they attend public or private schools." Id. § 121.54(1)(b). In this way the "city option," like the other transportation provisions, requires equal treatment of public and private school students.
The 1967 legislation soon spawned litigation. In a key early case interpreting the new statutory scheme, the Wisconsin Supreme Court explained that "[t]he important change" ushered in by the constitutional amendment and enabling legislation "was to provide that where transportation is furnished, either mandatory or permissive, it must be on a reasonably uniform basis to children attending either public or private schools." Cartwright , 162 N.W.2d at 10-11, 40 Wis.2d 494. Put slightly differently, "[w]hat the constitutional amendment and enabling legislation accomplished was to provide that the same consideration of safety and welfare should apply to public and private students alike." Id. , 40 Wis.2d 494, 162 N.W.2d at 11.
* * *
The Milwaukee Public School District ("MPS" or "the District") qualifies for the city option. The District serves children in the City of Milwaukee, where public bus service (operated by the Milwaukee County Transit System) is available. MPS has chosen to provide free transportation service to some resident children and thus is bound by the statutory obligation to treat public and private school students alike.
MPS Administrative Policy 4.04 contains the District's transportation regulations. Two features of the policy are at issue here. The first concerns the distance standards for determining eligibility for free transportation. The policy draws no distinction between public and private elementary-school students. Tracking the statutory mandate for noncity schools, MPS provides free transportation for public and private school students in grades K-8 who live "two miles or more" from their school. ADMINISTRATIVE POLICIES OF THE MILWAUKEE PUBLIC SCHOOLS, POLICY 4.04(2)(a)1., (b)1. (Nov. 12, 2014).
The eligibility rules are different for students in grades 9-12. MPS conditions free transportation service for high-school students on the two-mile rule plus an additional distance requirement. The District will transport only those high-school students *1018 who live "two miles or more" from their school and "more than one mile walking distance from public transportation." Id. 4.04(2)(a)3., (b)2. So families of high-school students who live within one mile of a public transit stop must pay their own transportation costs.
But MPS lifts this second condition for students who attend citywide public high schools or public high schools outside their neighborhood attendance area. Id. 4.04(5)(a)2., (b)2. In other words, students who attend public citywide high schools and live two miles or more from school get free transportation from the District regardless of their proximity to public transportation; their counterparts in private citywide high schools do not. The latter are ineligible for free transportation unless they live more than one mile from a public transit stop.
Students at private schools are disadvantaged in another way. Milwaukee children who attend private schools (regardless of grade level) cannot receive transportation from MPS unless the private school "submits the names, grade levels, and location of eligible students no later than the third Friday of September." Id. 4.04(2)(b)4. As my colleagues explain, in practice MPS requires private schools to submit their transportation rosters by July 1. Students who enroll after that date-whether later in the summer or after the school year has begun-are ineligible to receive transportation service from MPS for that school year. The roster requirement and July 1 cutoff date apply only to private schools. Late and mid-year enrollees in the District's own schools are not denied free transportation.
* * *
St. Joan Antida High School challenges these disparate transportation rules on behalf of itself and its students. St. Joan Antida is a private, all-girls high school in the City of Milwaukee with a citywide attendance area. That is, its students come from all over Milwaukee, not just the immediate neighborhood, so they are similarly situated in all material respects to students in public citywide high schools. Yet MPS treats them unequally for purposes of transportation eligibility. They are denied free transportation if they live within one mile of a public transportation stop. MPS does not apply this extra distance requirement to their counterparts at public citywide high schools. This difference in treatment, the school argues, violates the Fourteenth Amendment's Equal Protection Clause. St. Joan Antida also challenges the July 1 roster deadline, which operates as a cutoff date to receive transportation service but applies only to students in private schools.
My colleagues conclude that the challenged rules do not burden a fundamental right and thus do not trigger strict scrutiny under prevailing equal-protection doctrine. I agree and have nothing to add to the analysis in Section IIA of the majority opinion. The challenged rules need only be rationally related to a legitimate governmental interest. This is a highly deferential standard. As the majority explains, under rational-basis review, (1) the challenged law enjoys a presumption of validity; (2) the government's actual reasons for adopting it do not matter; and (3) the fit between the government's means and its ends can be both hypothetical and very loose. In short, as long as some legitimate governmental purpose is conceivably in play and the law might rationally be thought to serve that purpose, the test is satisfied. It's almost impossible to flunk this lenient standard.
Even so, there is a legal baseline below which local laws may not fall and still be thought minimally rational for equal-protection purposes. If state law places persons *1019 in the same class and directs local governments to treat everyone in the class uniformly, local governments cannot discriminate on the very terms forbidden by state law and expect to survive rational-basis review. The Supreme Court explained and applied this principle in Allegheny . There the Court reviewed a tax-assessment method used by a West Virginia county that assessed property based on its purchase price when last sold and adjusted stale data on an ad hoc and sporadic basis to account for the passage of time. Allegheny , 488 U.S. at 338, 109 S.Ct. 633. In practice this assessment method produced "gross disparities in the assessed value of generally comparable property." Id. State law, however, mandated that "taxation shall be equal and uniform throughout the State, and all property, both real and personal, shall be taxed in proportion to its value." Id. (quoting W. VA. CONST. art. X, § 1 ). Affected property owners sued, claiming that the county's assessment method violated their rights under the Equal Protection Clause.
The county maintained that its assessment method was a rational way to measure "true current value" because it used actual sale prices plus periodic adjustments "[a]s those data grow stale." Id. at 343, 109 S.Ct. 633. The Court disagreed, though it did "not intend to cast doubt upon the theoretical basis of such a scheme." Id. "That two methods are used to assess property in the same class is, without more, of no constitutional moment. The Equal Protection Clause 'applies only to taxation which in fact bears unequally on persons or property of the same class.' " Id. (quoting Charleston Fed. Savings & Loan Ass'n v. Alderson , 324 U.S. 182, 190, 65 S.Ct. 624, 89 L.Ed. 857 (1945) (collecting cases)). The factual predicate was easily established in Allegheny : "Petitioners' property has been assessed at roughly 8 to 35 times more than comparable neighborhood property, and these discrepancies have continued for more than 10 years with little change." Id. at 344, 109 S.Ct. 633.
The Court continued: "The States, of course, have broad powers to impose and collect taxes ... [and] may divide different kinds of property into classes and assign to each class a different tax burden so long as those divisions and burdens are reasonable." Id. "But West Virginia has not drawn such a distinction. Its Constitution and laws provide that all property of the kind held by petitioners shall be taxed at a rate uniform throughout the State according to its estimated market value." Id. at 345, 109 S.Ct. 633. State law required reasonable uniformity, but the county's assessment scheme "systematically produced dramatic differences in valuation" for similarly situated properties. Id. at 341, 109 S.Ct. 633. Because the valuation method consistently produced results that transgressed the state-law uniformity norm, it was not rationally related to a legitimate governmental purpose. Id. at 343-45, 109 S.Ct. 633. That is, state law negated any conceivable rational basis for the local discriminatory practice. The Court found an equal-protection violation. Id . at 346, 109 S.Ct. 633.
As my colleagues observe, the Court later described Allegheny as " 'the rare case where the facts precluded' any alternative reading of state law and thus any alternative rational basis" for the challenged local practice or rule. Armour v. City of Indianapolis , 566 U.S. 673, 687, 132 S.Ct. 2073, 182 L.Ed.2d 998 (2012) (quoting Nordlinger , 505 U.S. at 16, 112 S.Ct. 2326 ). In Armour homeowners sued the City of Indianapolis after it changed its method of funding sewer projects. Indiana law required that "costs [for sewer improvements] be primarily apportioned equally among all abutting lands or lots." IND. CODE § 36-9-39-15(b)(3) (2011). Indianapolis did just that, though it gave homeowners *1020 the option to pay the special assessment all at once or in installments. Armour , 566 U.S. at 676-77, 132 S.Ct. 2073. The City later abandoned that method in favor of a system that primarily relied on citywide bonds, spreading the cost across the entire municipal tax base. With this shift in policy, the City forgave any unpaid installments but did not refund homeowners who had already finished paying. Id . at 678-79, 132 S.Ct. 2073.
The Court held that the case did not implicate Allegheny . The statute required Indianapolis to apportion costs equally-which the City plainly had done-but state law said nothing about later forgiveness. The Court explained: "[T]he City followed state law by apportioning the cost of its [sewer] projects equally. State law says nothing about forgiveness, how to design a forgiveness program, or whether or when rational distinctions in doing so are permitted." Id . at 687, 132 S.Ct. 2073. That distinguished Armour from Allegheny . The Court characterized Allegheny as a "rare case" because it "involved a clear state law requirement clearly and dramatically violated." Id.
Unlike my colleagues, I do not read this last sentence as materially changing Allegheny 's fundamental holding. True, the Court in Allegheny said that the county's assessment method produced "dramatic differences in valuation," but that statement was descriptive, not doctrinal. If Armour truly limits Allegheny to local rules or practices that "dramatically" depart from state law, we'd need some standard to distinguish "dramatic" departures from those that are not. But Armour did not elaborate. On this point at least, I hesitate to read this passage from Armour as a doctrinal limitation on Allegheny .
Perhaps it's fair to read Armour as limiting Allegheny 's holding to clear violations of clear state uniformity mandates. If so, we have that here. As I've explained, the school-transportation statutes say-again and again-that school districts must treat public and private school students reasonably equally when it comes to access to publicly funded transportation. Districts operating under the city option need not provide free school transportation to any resident children, but if they provide it to some , then the law requires "reasonable uniformity in the transportation furnished to the pupils, whether they attend public or private schools." § 121.54(1)(b).
Put another way, if the city option were not in play, MPS would have a plain statutory duty to transport all students who live two miles or more from their school, whether public or private. § 121.54(2). But because public transit is readily available in Milwaukee, MPS may (1) provide no busing at all or (2) provide busing on equal terms to public and private school students. § 121.54(1)(b). MPS has chosen a third way. It provides transportation for students in public citywide high schools who satisfy the two-mile rule but not their counterparts in private citywide high schools. It has invoked the city option on discriminatory terms expressly forbidden by the statute. That's an irrational policy choice as a matter of law.
It's true, as my colleagues point out, that § 121.54(1)(b) has not been the subject of much appellate litigation in the state courts. The Wisconsin Supreme Court has not had occasion to address its scope. In one case the state court of appeals concluded that the term "reasonable uniformity" in § 121.54(1)(b) is ambiguous. St. John Vianney Sch. v. Bd. of Educ. of Sch. Dist. of Janesville , 114 Wis.2d 140, 336 N.W.2d 387, 393 (App. 1983). The precise question in St. John Vianney was whether the uniformity mandate in § 121.54(1)(b) requires school districts to provide the same mode of transportation to public and private school students. More particularly, the plaintiffs argued that if *1021 the district provided so-called "yellow school bus" service for students in public schools, then it had to provide "yellow school bus" service for students in private schools. Id. , 114 Wis.2d 140, 336 N.W.2d at 388-89. The court rejected that argument. Reading § 121.54(1)(b) in the context of the statutory scheme as a whole, the court noted that the school-transportation code gives school boards the discretion to use any of five different modes of transportation to comply with their statutory obligations. See WIS. STAT. § 121.55. The court said: "It would be unreasonable to conclude that the 'reasonable uniformity' requirement of sec. 121.54(1) abrogates the board's option to provide transportation by any of the methods expressly permitted under sec. 121.55." St. John Vianney , 336 N.W.2d at 393, 114 Wis.2d 140.
That was enough to decide the case, but the opinion continues with some extensive dicta. The court went on to observe that "[t]he overall concern behind the school transportation statutes is the safety and welfare of pupils." Id. Recognizing that "many factors affect ... safety and welfare," the court deduced from the broader statutory scheme that "[t]he distance a child lives from school is ... the principal factor with which the statutes are concerned." Id. Acknowledging that § 121.54(1)(b)"is silent regarding a distance standard in connection with the reasonable uniformity requirement," the court read the statute to "prevent[ ] a school board from distinguishing for transportation purposes between public and private school pupils on the basis of the distance they live from school." Id. , 114 Wis.2d 140, 336 N.W.2d at 394. On this understanding, the court said that "whatever ... distance standard the board chooses, the distance standard must be reasonably uniform in its application to public and private school pupils." Id.
The actual holding in St. John Vianney is limited. The court held only that the uniformity mandate in § 121.54(1)(b) does not require school districts to use identical modes of transportation for public and private school students. The court's extended discussion goes further, suggesting that whatever else the term "reasonable uniformity" may entail, at a minimum it prevents school districts from using different distance-from-school standards for public and private school students to determine their eligibility for free transportation. MPS's one-mile rule is a materially similar distance standard; high-school students who live within one mile of a public transit stop are ineligible for free transportation to school. But the rule is discriminatory on its face: it applies only to students at private citywide high schools; students at public citywide high schools get free transportation regardless of their proximity to public transit. On the reasoning of St. John Vianney , the statutory uniformity mandate forbids precisely this kind of discrimination by local school districts in the provision of free school transportation.
A case decided four years before St. John Vianney sheds even more light on the scope and operation of the uniformity requirement. In Hahner v. Board of Education , a school district provided busing on almost uniform terms to public and private schools. The problem was that it routinely refused to bus students to certain Catholic schools that held classes during a week when other schools in the district (public and private) had spring break. 89 Wis.2d 180, 278 N.W.2d 474, 475-76 (App. 1979). As a result, a small number of students attending Catholic schools did not receive busing for the entirety of their school year.
Addressing the "reasonable uniformity doctrine" in the school-transportation code,[1] the court held that the district did not have the discretion to deny transportation *1022 to Catholic school students when their schools were in session but the public schools were not. Id. , 89 Wis.2d 180, 278 N.W.2d at 478, 479-80. The opinion is significant for what it tells us about the dimensions of the reasonable-uniformity requirement: even a one-week denial of transportation to private school students is impermissible, as are deviations from the uniformity norm unrelated to student safety and welfare. Here is the key passage:
The crucial question is whether a school board's discretion in coordinating the scheduling of the transportation of pupils to public and private schools extends to not transporting pupils to private schools during a week when the public schools are closed for vacation. ... [T]he purpose of coordinating these transportation activities is "to insure the safety and welfare of the pupils" as provided in sec. 121.56, Stats. This court believes the objective of this requirement is to prevent discriminatory treatment of pupils attending private schools in the transportation provided them. The fact that the school district would save money by not transporting private school pupils during a week when the public schools are closed for vacation is a factor which bears no relationship to the safety and welfare of the pupils being transported to public schools.
Id. at 479 (emphasis added).
Together, St. John Vianney and Hahner make clear that MPS's discriminatory one-mile rule violates the statutory requirement of reasonable uniformity in the provision of free transportation to public and private school students. The challenged rule is unequal on its face and cannot be justified by reference to student safety and welfare, which are the only legitimate public-policy interests recognized by state law as justifications for school-transportation distinctions between public and private school students. Simply put, state law forbids MPS from making a policy choice to allocate free transportation on these unequal terms.
MPS defends its discriminatory one-mile rule based on abstract goals of avoiding overcapacity in its neighborhood schools, expanding access to special programming, and saving money. My colleagues accept these justifications as rational reasons for discriminating against private school students. With respect, state law leaves no room for these possible policy justifications. The state legislature has decreed a public policy of reasonably uniform treatment of public and private school students when it comes to free school transportation. School districts may not have different eligibility rules for public and private school students (except perhaps for safety and welfare reasons). Under clear state law, discriminating between public and private school students is not an available means to achieve other policy goals. Put somewhat differently, a local rule that defies the state-law uniformity command serves no legitimate governmental purpose. Like the county tax-assessment method in Allegheny , the MPS rule violates the Equal Protection Clause.[2]
*1023 In reaching this conclusion, I do not purport to "speak for the Wisconsin courts" any more than the Supreme Court purported to "speak for the West Virginia courts" when it found an equal-protection violation in Allegheny . Majority Op. at p. 1014. My conclusion simply recognizes that the statutory uniformity mandate removes the plausible policy justifications for this discriminatory local rule, which classifies students on the precise terms forbidden by statute.[3]
For similar reasons, the District's enforcement of the July 1 roster deadline violates the Equal Protection Clause. As I understand this claim, St. Joan Antida does not object to a general rule requiring private schools to submit a transportation roster by a date certain. It challenges the District's practice of denying free transportation to students who enroll after the deadline passes. Late and mid-year enrollees at public schools do not suffer the same fate. This policy, too, violates the state-law requirement of reasonable uniformity, leaving no rational basis for the discriminatory treatment.
My understanding of this claim differs from the majority's in another way. St. Joan Antida challenges the enforcement of the roster policy as a general matter. The school seeks an injunction against the discriminatory denial of transportation to students who enroll in private school after the July 1 deadline. St. Joan Antida also seeks damages; the monetary remedy is of course keyed to facts peculiar to the school and its students. But the parties have stipulated to damages.
My colleagues share some of my concerns about the rationality of this policy and remand for further clarification and development of this claim. As I see it, all that remains to be done on remand is to fashion an appropriate injunctive remedy and enter judgment granting injunctive and monetary relief. St. Joan Antida has explained that students who have not yet enrolled in private school by the July 1 deadline (and thus do not appear on a *1024 private school's roster) are denied free transportation for the ensuing school year. Late and mid-year enrollees in the public schools are not. MPS has not denied that it enforces its July 1 roster policy in this way. In light of the statutory uniformity mandate, this discriminatory treatment cannot be justified as rationally related to a legitimate governmental interest.
For these reasons, I would reverse and remand with instructions to enter judgment for St. Joan Antida.

Hahner does not specifically mention § 121.54(1)(b), but it relies on authorities that do. Hahner v. Bd. of Educ. , 89 Wis.2d 180, 278 N.W.2d 474, 478-80 (App. 1979) (citing Cartwright v. Sharpe , 40 Wis.2d 494, 162 N.W.2d 5, 10-11 (1968), and 61 Wis. Op. Att'y Gen. 240, 241 (1972)).

In Racine Charter One, Inc. v. Racine Unified School District , we accepted a school district's "cost" justification as a rational basis for not busing students to a charter school. 424 F.3d 677, 685-87 (7th Cir. 2005). I question that holding, which flatly contradicts Hahner . Racine Charter One held in the alternative that the charter school's students were not similarly situated "to those students who do receive the busing benefit." Id . at 683. I question that holding as well, but the case is perhaps distinguishable from ours on that ground.

My colleagues say that I've gone too far because my analysis "draws on legislative history and potentially comparable lower-court decisions (like St. John Vianney )." Majority Op. at p. 1014-15. That misunderstands Wisconsin's approach to statutory interpretation and the constitutional status of the state court of appeals.
Wisconsin has adopted a textualist method of statutory interpretation that limits the use of legislative history. State ex rel. Kalal v. Circuit Court for Dane Cty. , 271 Wis.2d 633, 681 N.W.2d 110, 124-26 (2004). But statutory history is not the same as legislative history. Statutory History , Black's Law Dictionary (10th ed. 2014) ("The enacted lineage of a statute, including prior laws, amendments, codifications, and repeals."); Legislative History , id. ("The proceedings leading to the enactment of a statute, including hearings, committee reports, and floor debates."). Statutory history provides context for statutory terms and is an accepted part of Wisconsin's textualist interpretive method. See County of Dane v. Labor &Indus. Review Comm'n , 315 Wis.2d 293, 759 N.W.2d 571, 580 (2009) ; Kalal , 681 N.W.2d at 126, 271 Wis.2d 633. The same is true of statements of purpose contained in the statutory text. Kalal , 681 N.W.2d at 125, 271 Wis.2d 633. Finally, Wisconsin's approach to statutory interpretation reads statutory language "in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results." Id ., 271 Wis.2d 633, 681 N.W.2d at 124. Everything I've said here is consistent with Wisconsin law.
Further, the state court of appeals, though divided into four districts, is a unitary court, and its published opinions are binding statewide precedent until "overrule[d], modif[ied,] or withdraw[n]" by the state supreme court. Cook v. Cook , 208 Wis.2d 166, 560 N.W.2d 246, 256 (1997). My analysis draws on a seminal decision of the state supreme court (Cartwright ) and two decisions of the court of appeals (St. John Vianney and Hahner ). All three have binding statewide precedential effect.