[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-12668
_____

D.C. Docket No. 1:16-cv-03310-TWT

ELLY MARISOL ESTRADA,
SALVADOR ALVARADO,
DIANA UMANA,
each an individual,

Plaintiffs-Appellants,

versus

MARK BECKER,
President of Georgia State University, in his individual and official capacity,
STEVE MICHAEL DORMAN, President of Georgia College and State University,
in his individual and official capacity,
BROOKS A. KEEL, President of Augusta University, in his individual and official
capacity,
JERE W. MOREHEAD, President of the University of Georgia, in his individual
and official capacity,
G.P. BUD PETERSON, President of the Georgia Institute of Technology, in his
individual and official capacity, et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(March 6, 2019)

Before TJOFLAT and JORDAN, Circuit Judges, and HUCK,[*] District Judge.

TJOFLAT, Circuit Judge:

This case is about a Policy[1] that the Georgia Board of Regents ("Regents") set. The Policy requires Georgia's three most selective colleges and universities to verify the "lawful presence" of all the students they admit. Under the Policy, applicants who received deferred action pursuant to the Deferred Action for Childhood Arrivals memorandum ("DACA Memo") cannot attend Georgia's selective schools. Appellants are students who are otherwise qualified to attend these schools, and they filed suit to challenge the Policy. At the heart of their suit is whether they are "lawfully present" in the United States. They say they are lawfully present based on the DACA Memo. Thus, appellants claim the Regents' Policy is preempted by federal law, and they argue the Policy violates their equal protection rights. The District Court found that appellants are not lawfully present, and it dismissed the suit.

_____

[*] Honorable Paul C. Huck, United States District Judge for the Southern District of Florida, sitting by designation.

[1] Technically, there are two separate policies. But because the policies work together, we will refer to them simply as "the Policy" for convenience.

2

After careful consideration of the record, and with the benefit of oral argument, we affirm the District Court's decision.

I.

Back in 2012, the Secretary of the Department of Homeland Security ("DHS") issued the DACA Memo, which encouraged government officials not to enforce federal immigration laws against certain children who came to the United States before age 16.  Instead, officials were encouraged to exercise their "prosecutorial discretion" and to focus on higher-priority cases.  The DACA Memo explicitly pointed out that it "confer[red] no substantive right, immigration status or pathway to citizenship.  Only the Congress, acting through its legislative authority, c[ould] confer these rights."  The DACA Memo simply set forth a policy that would guide officials when exercising discretion.

The individuals who meet the DACA Memo's criteria qualify for what is called "deferred action."  We refer to those individuals who ultimately get deferred action as "DACA recipients."  Under the Regents' Policy (explained below), DACA recipients cannot attend Georgia's most selective colleges and universities.

Under Georgia law, the Regents set the policies that govern the University System of Georgia.  O.C.G.A. § 50-36-1(d)(7).  The Policy at issue here limits who can attend the more selective schools in the University System.  It prevents any person "who is not lawfully in the United States" from attending any school that

3

"did not admit all academically qualified applicants"—in other words, the selective schools—"for the two most recent academic years."[2]

The Policy then requires these selective schools to verify the lawful presence of every student it admits.  There are several ways that a school can verify lawful presence.[3]  The Policy explicitly says that DACA recipients "are not considered lawfully present in the United States."

Appellants are DACA recipients[4] who are qualified to attend and want to apply to these selective schools, but the Policy prevents them from doing so.  They filed suit against the selective schools' presidents and the Regents and allege two causes of action.  Appellants allege that the Policy violates the Supremacy Clause based on three theories: the Policy is an unconstitutional regulation of immigration, the Policy is conflict preempted, and the Policy is field preempted.  Appellants also allege that the Policy violates the Equal Protection Clause.

---

[2] At the time appellants brought this lawsuit, the Policy applied to five schools: Georgia State University, Georgia College and State University, Augusta University, the University of Georgia, and the Georgia Institute of Technology.  Now, the parties seem to agree that it applies just to Georgia College and State University, the University of Georgia, and the Georgia Institute of Technology.

[3] A student's lawful presence is verified if he or she (1) is eligible for federal student aid; (2) has an F, J, or M visa, which allows the selective schools to verify using the Student and Exchange Visitor Program; or (3) is a naturalized citizen, immigrant, or nonimmigrant, which allows the selective schools to verify using the Systematic Alien Verification for Entitlements Program or by looking to documentation provided by the student.

[4] The Savannah Undocumented Youth Alliance organization was a party below, but it is not a party on appeal.

The District Court dismissed the case.  It rejected appellants' regulation of immigration claim and field preemption claim because it found that the Policy adopts the immigration classifications that Congress set out in the Immigration and Nationality Act ("Act").  The District Court rejected the conflict preemption claim because the DACA Memo conferred no substantive rights, and the Policy is thus consistent with federal immigration law.  Finally, the District Court rejected the equal protection claim because it found that appellants are not similarly situated to other noncitizens who are eligible to attend the selective schools.  The District Court noted that appellants have no lawful status and are not lawfully present in the United States.  By contrast, the other noncitizens who are eligible have lawful status or otherwise are lawfully present.

This appeal followed, and appellants challenge the dismissal of both causes of action.  We address each in turn.

## II.

We review *de novo* the District Court's order dismissing appellants' complaint for failure to state a claim.  *Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1303 (11th Cir. 2008).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007)).  We

5

assume the factual allegations of the complaint are true, and we construe them in the light most favorable to appellants. *Id.* We do not assume that any legal conclusions are true. *Id.*

## A.

Under the Supremacy Clause, the Constitution and the laws of the United States "shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. From this Clause we have the preemption doctrine, and any state law that "interfere[s] with, or [is] contrary to," federal law is preempted. *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211, 6 L. Ed. 23, 82 (1824).

There are at least three ways Congress may preempt state law. First, Congress may pass a statute with an express preemption provision. *Arizona v. United States*, 567 U.S. 387, 399, 132 S. Ct. 2492, 2500–01 (2012). Second, Congress may decide that a field will be regulated exclusively by the federal government. *Id.* In that case, there is no express preemption provision. Instead, we may infer an "intent to displace state law altogether" where "a framework of regulation [is] 'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Id.*, 132 S. Ct. at 2501 (second and third alterations in original) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S. Ct. 1146, 1152 (1947)).

6

Third, federal law preempts state law when the two conflict. *Id.* That is, when "compliance with both federal and state regulations is a physical impossibility," *id.* (quoting *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–143, 83 S. Ct. 1210, 1218 (1963)), or when "state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,'" *id.* (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S. Ct. 399, 404 (1941)).

In the immigration context, there is another preemption consideration. The Supreme Court has said that the "[p]ower to regulate immigration is unquestionably exclusively a federal power," and any state law that "regulat[es] . . . immigration" is unconstitutional. *DeCanas v. Bica*, 424 U.S. 351, 354–55, 96 S. Ct. 933, 936 (1976). That is, unlike field preemption, the Constitution itself preempts any state effort to regulate immigration, even if Congress has not expressly or impliedly preempted the state regulation. *See id.* at 355, 96 S. Ct. at 936. "[A] regulation of immigration . . . is essentially a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain." *Id.*

Appellants make three arguments: (1) the Policy amounts to an unconstitutional regulation of immigration, (2) the Policy is field preempted, and (3) the Policy is conflict preempted.

1.

7

The Supreme Court has said that a law is a "regulation of immigration" if it "essentially . . . determin[es]" (1) "who should or should not be admitted into the country" or (2) "the conditions under which a legal entrant may remain." *Id.* Appellants claim the Policy does both.

First, appellants argue the Policy is an unconstitutional regulation of immigration because it "classif[ies] noncitizens in a manner that does not conform to federal immigration classifications."[5]  Appellants claim they are "lawfully present" under the Act, but they are not considered "lawfully present" under the Policy.  Thus, appellants conclude, the Policy's classification of "lawfully present" is inconsistent with federal classifications.  And the Supreme Court has instructed that "[t]he States enjoy no power with respect to the classification of aliens." *Plyler v. Doe*, 457 U.S. 202, 225, 102 S. Ct. 2382, 2399 (1982).[6]

We begin by noting that "lawfully present" is not a standalone immigration classification, and it is not defined anywhere in the Act.  Nor does the Policy

---

[5] Appellants seem to assume that a state's inconsistent immigration classification—without any additional harm—automatically satisfies the *DeCanas* definition of "regulation of immigration."  They rely on a Ninth Circuit decision and a district court decision to support that assumption.  *See Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 977 (9th Cir. 2017) (amended opinion), *cert. denied*, 138 S. Ct. 1279, 200 L. Ed. 2d 468 (2018); *Hispanic Interest Coal. of Ala. v. Bentley*, No. 5:11-CV-2484-SLB, 2011 WL 5516953, at *23 (N.D. Ala. Sept. 28, 2011), *aff'd in part, vacated in part, rev'd in part sub nom. Hispanic Interest Coal. of Ala. v. Governor of Ala.*, 691 F.3d 1236 (11th Cir. 2012).  Because we find that the Policy is consistent with federal immigration classifications, we need not decide whether appellants' assumption is correct.

[6] We do point out that *Plyler* is not a preemption case.  *See, e.g.*, *Brewer*, 855 F.3d at 961 (Kozinski, J., dissenting from denial of rehearing en banc) ("Justice Brennan's 1982 majority opinion—a 5-4 opinion that garnered three individual concurrences and has been questioned continuously since publication—never once mentions preemption.").

define "lawfully present."[7]  Instead, the Policy instructs the selective schools to "verify" a person's lawful status based on determinations made by Congress.[8] That is, the Policy borrows from federal standards to verify lawful presence.

For example, a covered institution may use an applicant's eligibility for federal student aid to verify his or her lawful status.  But Congress, not the State of Georgia, set the eligibility standard for federal student aid.  20 U.S.C. § 1091.[9]  A selective school may also use an applicant's status as a naturalized citizen, immigrant, or nonimmigrant to verify his or her lawful status.  Again, Congress decided who is eligible to become a naturalized citizen, *see, e.g.*, 8 U.S.C. §§ 1421–1459; to receive an immigrant visa, 8 U.S.C. §§ 1101(a)(15), 1201(a)(1)(A), 1202(a)–(b); and to receive a nonimmigrant visa, 8 U.S.C. §§ 1101(a)(15),

---

[7] As we explained above, the Policy does say that DACA recipients are not considered lawfully present in the United States.  But that language just means the selective schools cannot use DACA status to verify lawful presence.  This is because the Policy instructs the selective schools to verify lawful presence by looking to federal immigration classifications.  And under federal immigration classifications, DACA recipients are not lawfully present.

[8] At first glance, one verification procedure is different from the rest.  The selective schools may verify a student's lawful presence if the student provides a Georgia driver's license or state-issued ID that was issued by the State of Georgia after January 1, 2008.  But the Policy explicitly notes that a "limited term license" or ID "is not acceptable."  This procedure is functionally equivalent to proving U.S. citizenship because noncitizens may only get licenses or IDs that are "limited term" in that the license or ID is valid only during the applicant's authorized stay in the United States.  *See* O.C.G.A. §§ 40-5-21.1(a).

[9] Among other things, a student must

be a citizen or national of the United States, a permanent resident of the United States, or able to provide evidence from the Immigration and Naturalization Service that he or she is in the United States for other than a temporary purpose with the intention of becoming a citizen or permanent resident.

20 U.S.C. § 1091(a)(5).

1201(a)(1)(B), 1202(c)–(d).  The Policy clearly looks to federal standards to verify lawful presence, and it does not require a state agent to make any independent determination.  *See, e.g.*, *League of United Latin Am. Citizens v. Wilson*, 908 F. Supp. 755, 772 (C.D. Cal. 1995) (finding that a subsection of a state statute is an impermissible regulation of immigration because the state classification "*is not in any way tied to federal standards*"), *on reconsideration in part*, 997 F. Supp. 1244 (C.D. Cal. 1997); *see also id.* (explaining that the same subsection requires state agents to make independent determinations based on "state-created criteria").

Appellants rely on a discrete definition of "<u>un</u>lawful presence" in the Act to support their argument, and the argument proceeds in two steps.  First, appellants argue the Act delegates to the DHS the authority to enforce the statute.  As part of this delegation, appellants say, the Executive has authority to issue discretionary grants of deferred action.  In support, appellants cite 8 U.S.C. § 1103(a)(3), which allows the DHS Secretary to "perform such other acts as he deems necessary for carrying out his authority under the provisions of this chapter."  Of course, this provision does not explicitly allow DHS to issue discretionary grants of deferred action, but it is well known that "[a] principal feature of the removal system is the broad discretion exercised by immigration officials," *Arizona*, 567 U.S. at 396, 132 S. Ct. at 2499.  Second, appellants argue that aliens are lawfully present in the

10

United States—under the Act—if they have been granted deferred action by the Executive Branch.

Appellants rely on 8 U.S.C. § 1182(a)(9)(B)(ii) to support their deferred-action-means-lawful-presence argument.  Section 1182 is titled "Inadmissible aliens," and the relevant part provides the following:

**(a) Classes of aliens ineligible for visas or admission**

. . .

    **(9) Aliens previously removed**

. . .

        **(B) Aliens unlawfully present**

. . .

            **(ii) Construction of unlawful presence**

            *For purposes of this paragraph*, an alien is deemed to be unlawfully present in the United States if the alien is present in the United States after the expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled.

(emphasis added).  Section 1182(a)(9)(B)(ii) does not stand for the broad proposition that appellants say it does.

Under § 1182(a)(9)(B)(i), aliens who are "unlawfully present in the United States" for a period of time, leave the United States, then seek admission to the United States before certain periods of time have passed are inadmissible.  At best,

11

clause (ii) simply means that these aliens—those "previously removed"—are lawfully present during a period of stay authorized by the Attorney General.[10]  But this part of the statute does not even apply to appellants because they have not previously been removed.

Instead, appellants are inadmissible and subject to removal proceedings.  *See* 8 U.S.C. § 1182(a)(6)(A)(i) ("An alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible."); *id.* § 1229a(a)(2) (noting that inadmissible aliens are removable).  As DACA recipients, they simply were given a reprieve from potential removal; that does not mean they are in any way "lawfully present" under the Act.  *See Ga. Latino All. for Human Rights v. Governor of Ga.*, 691 F.3d 1250, 1258 n.2 (11th Cir. 2012) ("Deferred action status, also known as 'non-priority status,' amounts to, in practical application, a reprieve for deportable aliens.  No action (i.e., no deportation) will be taken . . . against an alien having deferred action status." (alteration in original) (quoting *Pasquini v. Morris*, 700 F.2d 658, 661 (11th Cir.1983))).

---

[10] But "[e]ven if it were true that an immigrant was 'unlawfully present' if he stayed beyond a period approved by the Attorney General, this doesn't mean he would be 'lawfully present' if he didn't stay beyond such a period.  In formal logic, the inverse of a conditional cannot be inferred from the conditional." *Brewer*, 855 F.3d at 960 n.3 (Kozinski, J., dissenting from denial of rehearing en banc).

So, appellants have not shown that they are lawfully present under the Act. Nor have they shown that the Policy's classifications are inconsistent with federal immigration classifications. It is quite the opposite: the Policy borrows from federal standards.

Next, appellants argue the Policy is an unconstitutional regulation of immigration because it regulates the "conditions" in which aliens may remain in the United States. They say the Policy creates its own standards for "lawful presence," and that itself is a regulation of immigration under *DeCanas*. This repackaged argument fails because it rests on a faulty premise—the Policy does not create standards for lawful presence. As we explained above, the Policy merely instructs selective schools to verify lawful presence using federal standards.

Then, appellants get to the heart of their argument. They claim the Policy intrudes on the "conditions" of their presence in the United States because it prevents them from attending the three selective schools. It is true that the states "can neither add to nor take from the conditions lawfully imposed by Congress upon admission, naturalization and residence of aliens in the United States or the several states." *DeCanas*, 424 U.S. at 358 n.6, 96 S. Ct. at 938 n.6. But appellants fail to show how the Policy relates, in any way, to conditions that Congress has imposed on their residence in the United States. It is not as though Congress has given deferred action holders the right to attend state universities or colleges. And

13

Congress has not required deferred action holders to attend college if they want to remain in the United States. Appellants really seem to be saying the Policy is a regulation of immigration simply because aliens are one subject of the Policy. But as *DeCanas* made clear, "that aliens are the subject of a state statute does not render it a regulation of immigration." *Id.* at 355, 96 S. Ct. at 936. Appellants' broad view of what amounts to a "condition under which a legal entrant should remain" in the United States would gut *DeCanas*'s warning that a law is not automatically a regulation of immigration simply because it deals with aliens. *See id.*

We hold that the Policy does not regulate immigration.

2.

Second, appellants argue that the Policy is field preempted because Congress occupies the field of federal immigrant classifications. Recall, when dealing with field preemption, we may infer an "intent to displace state law altogether" where "a framework of regulation [is] 'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Arizona*, 567 U.S. at 399, 132 S. Ct. at 2501 (second and third alterations in original) (quoting *Rice*, 331 U.S. at 230, 67 S. Ct. at 1152).

14

"To discover the boundaries [of a particular field] we look to the federal statute itself, read in the light of its constitutional setting and its legislative history." *DeCanas*, 424 U.S. at 360 n.8, 96 S. Ct. at 938 n.8 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 78–79, 61 S. Ct. 399, 410 (1941) (Stone, J., dissenting)). We must also decide what the state law or policy actually regulates to see whether the state regulation touches on the field that Congress has occupied. *See, e.g.*, *id.* at 356–57, 96 S. Ct. at 937–38 (describing a state law that prevented employers from hiring aliens who were not entitled to lawful residence in the United States as a regulation of the "employment of illegal aliens").

Here, the Policy regulates who can attend Georgia's three most selective schools. And "States historically have been sovereign" in the area of education. *United States v. Lopez*, 514 U.S. 549, 564, 115 S. Ct. 1624, 1632 (1995). We find nothing in the Act that allows us to infer an "intent to displace state law altogether," *Arizona*, 567 U.S. at 399, 132 S. Ct. at 2501, in the field of undocumented immigrant education. In fact, appellants do not even argue that the Act occupies that field. Instead, they argue that the appropriate field is a much broader one: immigration classification. But as we explained above, the Policy does not create a new immigration classification—quite the opposite. The Policy requires selective schools to verify lawful presence by using federally created standards. Nor is undocumented immigrant education within the central aim of

15

federal regulation simply because the Act comprehensively regulates *immigration itself*.  *See DeCanas*, 424 U.S. at 359, 96 S. Ct. at 938 ("The comprehensiveness of the [Act's] scheme for regulation of immigration and naturalization, without more, cannot be said to draw in the employment of illegal aliens as 'plainly within . . . (that) central aim of federal regulation.'" (second and third alterations in original) (quoting *San Diego Unions v. Garmon*, 359 U.S. 236, 244, 79 S. Ct. 773, 779 (1959))).

Next, appellants argue that Congress showed a clear intent to occupy the field by assigning discretionary decisions to the Executive and by largely insulating those decisions from judicial review.  According to appellants, this shows congressional "intent to achieve flexibility in immigration enforcement while establishing the [E]xecutive's word as final in discretionary matters."  But again, this argument focuses on the wrong field: the Policy has nothing at all to do with immigration enforcement.  Even if we assume that Congress does occupy the field of immigration enforcement, that does nothing to help appellants because the Policy is unrelated to immigration enforcement.  Nor does the Policy in any way deal with immigration issues over which the Executive has discretion.[11]

---

[11] For example, appellants cite *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 486–87, 119 S. Ct. 936, 945 (1999), to support their proposition that Congress assigned discretionary decisions to the Executive and insulated those decisions from judicial review.  In turn, *Reno* cites examples where the Act gives the Executive discretion and insulates it from review: "8 U.S.C. § 1252(a)(2)(A) (limiting review of any claim arising from the

16

We hold that the Policy is not field preempted.

3.

Third, appellants argue the Policy is conflict preempted.  State law and federal law conflict when it is physically impossible to comply with both or when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399, 132 S. Ct. at 2501 (quoting *Hines*, 312 U.S. at 67, 61 S. Ct. at 404).  Appellants focus on the second type of conflict preemption and claim the Policy stands as an obstacle to Congress's purposes and objectives.

"What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects . . . ."  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373, 120 S. Ct. 2288, 2294 (2000).  "If the purpose of the [federal] act cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect—the state law must yield to the

---

inspection of aliens arriving in the United States); § 1252(a)(2)(B) (barring review of denials of discretionary relief authorized by various statutory provisions); § 1252(a)(2)(C) (barring review of final removal orders against criminal aliens); § 1252(b)(4)(D) (limiting review of asylum determinations for resident aliens)."  525 U.S. at 486–87, 119 S. Ct. at 945.

But the Policy is totally unrelated to inspecting aliens, discretionary relief, final removal orders, and asylum determinations.  So the Policy in no way upsets the Executive's discretionary decisions because it has nothing to do with those decisions.  This exposes the problem with appellants' argument: it relies on a field that the Policy does not regulate.

17

regulation of Congress within the sphere of its delegated power." *Id.* (quoting *Savage v. Jones*, 225 U.S. 501, 533, 32 S. Ct. 715, 726 (1912)).

Appellants argue that one purpose of the Act is to give the Executive discretion over the removal of aliens, and they claim the Policy conflicts with this purpose. Appellants correctly point out that the Executive has discretion over the removal process, *see Arizona*, 567 U.S. at 396, 132 S. Ct. at 2499, and deferred action is one example of that discretion, *Reno*, 525 U.S. at 483–84, 119 S. Ct. at 943. But the Policy—which deals only with admission to Georgia's selective schools—does not obstruct this purpose. This argument fails.

Next, appellants note that the Executive has a historical practice of adopting policies that make deferred action available to large groups. But the Policy does not invalidate the DACA Memo or interfere with deferred action in any way. In fact, the Policy says nothing about the validity of deferred action and limits itself only to college and university admission at Georgia's three most selective schools.

In sum, the Policy prevents DACA recipients from attending Georgia's three most selective schools, and appellants have not alleged any congressional purpose or objective in conflict with the Policy.[12] *See, e.g.*, *Arizona*, 567 U.S. at 409, 132

---

[12] If anything, the Policy is consistent with 8 U.S.C. § 1621(a). In § 1621, Congress decided which aliens are eligible for state and local benefits, including postsecondary education benefits. *See* 8 U.S.C. § 1621(c)(1)(B). Only the following aliens are eligible: (1) qualified aliens, (2) nonimmigrants, and (3) aliens paroled into the United States. *Id.* § 1621(a). DACA recipients are not eligible.

S. Ct. at 2506 (holding a state law that "authoriz[ed] state officers to decide whether an alien should be detained for being removable" was conflict preempted because it "violates the principle that the removal process is entrusted to the discretion of the Federal Government").

We hold that the Policy is not conflict preempted.

### B.

Under the Equal Protection Clause, "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Clause does not prohibit classifications altogether, *Nordlinger v. Hahn*, 505 U.S. 1, 10, 112 S. Ct. 2326, 2331 (1992), and the applicable level of scrutiny drives our analysis, *see, e.g.*, *Armour v. City of Indianapolis*, 566 U.S. 673, 680, 132 S. Ct. 2073, 2079–80 (2012).

If a classification neither burdens a fundamental right nor targets a suspect class, rational basis review applies. *See Armour*, 566 U.S. at 680, 132 S. Ct. at 2080. Here, the Policy deals with postsecondary education, and the Supreme Court has never said that education is a fundamental right. *See Kadrmas v. Dickinson Pub. Sch.*, 487 U.S. 450, 458, 108 S. Ct. 2481, 2487–88 (1988). The Policy does not classify applicants based on a suspect classification because "[u]ndocumented aliens cannot be treated as a suspect class." *Plyler*, 457 U.S. at 223, 102 S. Ct. at

19

2398;[13] *see also LeClerc v. Webb*, 419 F.3d 405, 416 (5th Cir. 2005) ("The [Supreme] Court has never applied strict scrutiny review to a state law affecting any . . . alienage classifications [except for those involving resident aliens or permanent resident aliens], *e.g.*, illegal aliens, the children of illegal aliens, or nonimmigrant aliens."). While the Supreme Court has said that "classifications based on alienage . . . are inherently suspect and subject to close judicial scrutiny," *Graham v. Richardson*, 403 U.S. 365, 372, 91 S. Ct. 1848, 1852 (1971), it has never "held that *all* limitations on aliens are suspect," *Foley v. Connelie*, 435 U.S. 291, 294, 98 S. Ct. 1067, 1070 (1978) (emphasis added), let alone limitations on illegal aliens.

Appellants argue that strict scrutiny applies, and they rely on two Supreme Court cases for support. In *Nyquist v. Mauclet*, the Supreme Court applied "close judicial scrutiny," 432 U.S. 1, 7, 97 S. Ct. 2120, 2124 (1977), and struck down a

---

[13] In *Plyler*, the Court did apply some type of heightened rational basis review. 457 U.S. at 224, 102 S. Ct. at 2398 (noting that the state law could "hardly be considered rational unless it furthers some *substantial* goal of the State" (emphasis added)). But the level of review was not based on a suspect class. Indeed, the Court was very clear that "[u]ndocumented aliens cannot be treated as a suspect class." *Id.* at 223, 102 S. Ct. at 2398. Instead, the Court seemed to apply heightened scrutiny because the state law, by denying the children of undocumented aliens a "basic education," "impose[d] a lifetime hardship on a discrete class of children not accountable for their disabling status." *Id.* But the Court has not extended the holding in *Plyler* beyond the "unique circumstances" in that case. *Kadrmas*, 487 U.S. at 459, 108 S. Ct. at 2488 (quoting *Plyler*, 457 U.S. at 239, 102 S. Ct. at 2406 (Powell, J., concurring)).

20

law that barred resident aliens[14] from receiving state financial assistance for higher education, *id.* at 12, 97 S. Ct. at 2127.  In *Graham v. Richardson*, the Supreme Court applied "strict judicial scrutiny" and struck down a state law that denied resident aliens disability benefits.  403 U.S. 365, 376, 91 S. Ct. 1848, 1854 (1971).

At first glance, this case seems similar to *Nyquist* and *Graham*.  In *Nyquist* and *Graham*, the challengers were lawfully admitted to the United States as resident aliens.  *Nyquist*, 432 U.S. at 4, 97 S. Ct. at 2123; *Graham*, 403 U.S. at 369, 91 S. Ct. at 1850.  Here, appellants were granted deferred status.  In *Nyquist* and *Graham*, the challengers were denied some state-sponsored benefit.  *Nyquist*, 432 U.S. at 5, 97 S. Ct. at 2123 (financial assistance for higher education); *Graham*, 403 U.S. at 369, 91 S. Ct. at 1850 (disability benefits).  And here, appellants are denied admission to Georgia's selective colleges and universities.

But are there two important differences between this case and *Nyquist* and *Graham*.  First, *Nyquist* and *Graham* involved state laws that affected *resident* aliens, not *illegal* aliens.  Second, as the Supreme Court later clarified, the state laws at issue in *Nyquist* and *Graham* "struck at the noncitizens' ability to exist in the community, a position seemingly inconsistent with the congressional determination to admit the alien to permanent residence."  *See Foley*, 435 U.S. at

---

[14] The state law did not use the term "resident alien," but in light of other federal laws, the Supreme Court explained that the state law was "of practical significance only to resident aliens."  *Id.* at 4, 98 S. Ct. at 2123.

295, 98 S. Ct. at 1070. Here, the Policy neither strikes at appellants' ability to exist in the community nor conflicts with any congressional determination. Appellants may pursue postsecondary education outside these three schools, and the Policy in no way undermines appellants' deferred action status. Thus, "[w]e decline to extend the Supreme Court's decisions concerning resident aliens to different alien categories." *LeClerc*, 419 F.3d at 419.

Alternatively, appellants argue that heightened scrutiny should apply for two reasons.

First, appellants claim heightened scrutiny applies because they cannot vote or rely on the political process. Indeed, the Supreme Court has noted that a "more searching judicial inquiry" may be needed when a state law targets "discrete and insular minorities" who have no direct voice in the political process. *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4, 58 S. Ct. 778, 784 n.4 (1938). And the Supreme Court has in fact found that resident aliens are the type of "discrete and insular" minorities who have no political voice and thus qualify for heightened scrutiny. *See, e.g.*, *Foley*, 435 U.S. at 294, 98 S. Ct. at 1070 ("[T]he Court has treated certain restrictions on aliens with 'heightened judicial solicitude,' a treatment deemed necessary since aliens—pending their eligibility for citizenship—have no direct voice in the political processes." (citation omitted)

22

(quoting *Graham*, 403 U.S. at 372, 91 S. Ct. at 1852) (citing *Carolene Prods.*, 304 U.S. at 152–53 n.4, 58 S. Ct. 783–84 n.4)).

But here, appellants' lack of legal voice is tied to their illegal presence. Remember, they are inadmissible and thus removable.  8 U.S.C. §§ 1182(a)(6)(A)(i), 1229a(a)(2).  By contrast, "[c]haracterizing resident aliens as a *Carolene Products* minority reconciles the breadth of rights and responsibilities they enjoy with their lack of political capacity."  *LeClerc*, 419 F.3d at 417.  Unlike resident aliens, appellants—who are here illegally and were given a reprieve from removal—are not the sort of minority that is entitled to strict scrutiny protection under *Carolene Products*.

Second, appellants say education is an important right that triggers heightened scrutiny.  Yet they point to no Supreme Court or Eleventh Circuit case that applies heightened scrutiny to a classification that burdens education.[15]  Thus,

---

[15] Appellants do cite a district court case that applied heightened scrutiny, but it is distinguishable.  In *Ruiz v. Robinson*, the District Court applied heightened scrutiny to a Florida regulation that denied in-state (and thus cheaper) tuition to U.S. citizens because they were unable to prove their parents' federal immigration status.  892 F. Supp. 2d 1321, 1325–26 (S.D. Fla. 2012).  The Court explained that "the State regulations deny a benefit to Plaintiffs and impinge Plaintiffs' ability to attain post-secondary education at the State's public institutions solely by virtue of their parents' undocumented status, and in a very real way the regulations punish the citizen children for the acts of their parents."  *Id.* at 1330.  Here, the Policy does not affect appellants' ability to get a postsecondary education in the same way the Florida regulation did in *Ruiz*.  Appellants are prevented from attending just three schools in Georgia.  By contrast, the plaintiffs in *Ruiz* could not get in-state tuition at any public school in Florida.  *Id.* at 1325–26.  There is also one other relevant difference: appellants are not citizens, but the plaintiffs in *Ruiz* are.  *Id.* at 1323–24.

we decline to extend heightened scrutiny to a classification that allegedly burdens postsecondary education.

We are left with rational basis review, and the Policy easily survives. Under rational basis review, a classification does not violate the Equal Protection Clause so long as "there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Armour*, 566 U.S. at 680, 132 S. Ct. at 2080 (quoting *Heller v. Doe*, 509 U.S. 312, 319–20, 113 S. Ct. 2637, 2642 (1993)). "[A] classification 'must be upheld against equal protection challenge if there is *any* reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Heller*, 509 U.S. at 320, 113 S. Ct. at 2642 (emphasis added) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313, 113 S. Ct. 2096, 2101 (1993)). We assume the classification is constitutional, and the appellants—as the challengers—must "negative every conceivable basis which might support" the classification. *See id.*, 113 S. Ct. at 2643 (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364, 93 S. Ct. 1001, 1006 (1973)).

The Policy applies only to selective schools that did not admit all qualified applicants in the last two years. Because the schools cannot admit all qualified applicants, the Georgia System Regents must prioritize which students to admit. The Regents could have decided to prioritize those students who are more likely to stay in Georgia after graduation, and the Regents might have decided that DACA

24

recipients are less likely to do so because they are removable at any time.  *See* 8 U.S.C. §§ 1182(a)(6)(A)(i), 1229a(a)(2).  That is, the Regents could have reasonably concluded that it would be unwise to invest state resources in DACA recipients.  Thus, the Policy is rationally related to the state's legitimate interest in responsibly investing state resources.

Appellants allege that the Policy allows similarly situated individuals— refugees, parolees, and asylees—to enroll in the selective schools.  But refugees, parolees, and asylees are not similarly situated to DACA recipients.  They all are eligible for federal student aid.  *See* 1 U.S. Dep't of Educ., *Federal Student Aid Handbook* 1-34 to 1-35 (2017-2018 ed.) [hereinafter *Handbook*].[16]  And to be eligible for federal aid, a student must be "in the United States for other than a temporary purpose with the intention of becoming a citizen or permanent resident."[17]  20 U.S.C. § 1091(a)(5); 34 C.F.R. § 668.33(a).  Plus, refugees "are required to apply for Lawful Permanent Residency (LPR) status after one year." *Handbook*, *supra*, at 1–34; *see also* 8 U.S.C. § 1159; 8 C.F.R. § 209.1.  As the status suggests, lawful permanent residents are lawfully authorized to live permanently in the United States.  Similarly, parolees "must provide evidence . . .

---

[16] The *Handbook* may be accessed here: https://ifap.ed.gov/fsahandbook/attachments/1718FSAHbkVol1Master.pdf.

[17] Alternatively, a student is also eligible if he or she is a citizen, a national, or a permanent resident of the United States.  20 U.S.C. § 1091(a)(5); 34 C.F.R. § 668.33(a).  But appellants do not explicitly argue that they are similarly situated to these groups.

that they are in the U.S. for other than a temporary purpose and intend to become a citizen or permanent resident." *Handbook*, *supra*, at 1–34 to 1–35.  Finally, asylees can apply for permanent residency after one year.  *Id.* at 1–34; *see also* 8 C.F.R. § 209.2(a)(1)(ii).  These three groups have more permanent ties to the United States than DACA recipients, and it would be rational for the Regents to conclude refugees, parolees, and asylees are more likely to stay in Georgia after graduation.[18]

Appellees offer another interest that the Policy serves: it allocates limited state resources to U.S. citizens and to those whom Congress has affirmatively allowed to remain in the United States.  As explained above, appellants are not lawfully present in the United States.  By contrast, the noncitizens who are eligible for admission under the Policy are either lawfully admitted under the Act or they have a statutory designation that allows them to remain in the United States.  The Policy is rationally related to that legitimate state interest.

We hold that the Policy is rationally related to a legitimate government interest, and appellants alleged no facts that would show the classification is irrational.

### III.

---

[18] Nor is the Policy necessarily irrational if the Regents' conclusion is wrong, *see, e.g.*, *Beach Commc'ns, Inc.*, 508 U.S. at 315–16, 113 S. Ct. at 2102, or if the Policy is "both underinclusive and overinclusive," *Vance v. Bradley*, 440 U.S. 93, 108, 99 S. Ct. 939, 948 (1979).

The District Court's decision is

**AFFIRMED.**