# SUPREME COURT OF THE UNITED STATES

KRISTINA BOX, COMMISSIONER, INDIANA DEPART-
MENT OF HEALTH, ET AL. *v.* PLANNED
PARENTHOOD OF INDIANA AND
KENTUCKY, INC., ET AL.

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED
STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

No. 18–483.   Decided May 28, 2019

PER CURIAM.

Indiana's petition for certiorari argues that the Court of Appeals for the Seventh Circuit incorrectly invalidated two new provisions of Indiana law: the first relating to the disposition of fetal remains by abortion providers; and the second barring the knowing provision of sex-, race-, or disability-selective abortions by abortion providers. See Ind. Code §§16−34−2−1.1(a)(1)(K), 16−34−3−4(a), 16−34−4−4, 16−34−4−5, 16−34−4−6, 16−34−4−7, 16−34−4−8, 16−41−16−4(d), 16−41−16−5 (2018). We reverse the judgment of the Seventh Circuit with respect to the first question presented, and we deny the petition with respect to the second question presented.

I

The first challenged provision altered the manner in which abortion providers may dispose of fetal remains. Among other changes, it excluded fetal remains from the definition of infectious and pathological waste, §§16−41−16−4(d), 16−41−16−5, thereby preventing incineration of fetal remains along with surgical byproducts. It also authorized simultaneous cremation of fetal remains, §16−34−3−4(a), which Indiana does not generally allow for human remains, §23−14−31−39(a). The law did not affect a woman's right under existing law "to determine the final disposition of the aborted fetus." §16−34−3−2(a).

Respondents have never argued that Indiana's law creates an undue burden on a woman's right to obtain an abortion. Cf. *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833, 874 (1992) (plurality opinion). Respondents have instead litigated this case on the assumption that the law does not implicate a fundamental right and is therefore subject only to ordinary rational basis review. See *Planned Parenthood of Indiana and Kentucky, Inc.* v. *Commissioner of Indiana State Dept. of Health*, 888 F. 3d 300, 307 (2018). To survive under that standard, a state law need only be "rationally related to legitimate government interests." *Washington* v. *Glucksberg*, 521 U. S. 702, 728 (1997).

The Seventh Circuit found Indiana's disposition law invalid even under this deferential test. It first held that Indiana's stated interest in "the 'humane and dignified disposal of human remains'" was "not . . . legitimate." 888 F. 3d, at 309. It went on to hold that even if Indiana's stated interest were legitimate, "it [could not] identify a rational relationship" between that interest and "the law as written," because the law preserves a woman's right to dispose of fetal remains however she wishes and allows for simultaneous cremation. *Ibid.*

We now reverse that determination. This Court has already acknowledged that a State has a "legitimate interest in proper disposal of fetal remains." *Akron* v. *Akron Center for Reproductive Health, Inc.*, 462 U. S. 416, 452, n. 45 (1983). The Seventh Circuit clearly erred in failing to recognize that interest as a permissible basis for Indiana's disposition law. See *Armour* v. *Indianapolis*, 566 U. S. 673, 685 (2012) (on rational basis review, "the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it"). The only remaining question, then, is whether Indiana's law is rationally related to the State's interest in proper disposal of fetal remains. We conclude that it is, even if it

is not perfectly tailored to that end. See *ibid.* (the State need not have drawn "the perfect line," as long as "the line actually drawn [is] a rational" one). We therefore uphold Indiana's law under rational basis review.

We reiterate that, in challenging this provision, respondents have never argued that Indiana's law imposes an undue burden on a woman's right to obtain an abortion. This case, as litigated, therefore does not implicate our cases applying the undue burden test to abortion regulations. Other courts have analyzed challenges to similar disposition laws under the undue burden standard. See *Planned Parenthood of Indiana and Kentucky, Inc.* v. *Commissioner of Indiana State Dept. of Health*, 2018 WL 3655854, \*2–\*3 (CA7, June 25, 2018) (Wood, C. J., concurring in denial of rehearing en banc). Our opinion expresses no view on the merits of those challenges.

II

Our opinion likewise expresses no view on the merits of the second question presented, *i.e.*, whether Indiana may prohibit the knowing provision of sex-, race-, and disability-selective abortions by abortion providers. Only the Seventh Circuit has thus far addressed this kind of law. We follow our ordinary practice of denying petitions insofar as they raise legal issues that have not been considered by additional Courts of Appeals. See this Court's Rule 10.

\*  \*  \*

In sum, we grant certiorari with respect to the first question presented in the petition and reverse the judgment of the Court of Appeals with respect to that question. We deny certiorari with respect to the second question presented.

*It is so ordered.*

JUSTICE SOTOMAYOR would deny the petition for a writ of certiorari as to both questions presented.

# SUPREME COURT OF THE UNITED STATES

KRISTINA BOX, COMMISSIONER, INDIANA DEPART-
MENT OF HEALTH, ET AL. *v.* PLANNED
PARENTHOOD OF INDIANA AND
KENTUCKY, INC., ET AL.

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED
STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

No. 18–483.   Decided May 28, 2019

JUSTICE THOMAS, concurring.

Indiana law prohibits abortion providers from treating the bodies of aborted children as "infectious waste" and incinerating them alongside used needles, laboratory-animal carcasses, and surgical byproducts. Ind. Code §16–41–16–4(d) (2019); see §§16–41–16–2, 16–41–16–4, 16–41–16–5; Ind. Admin. Code, tit. 410, §§35–1–3, 35–2–1(a)(2) (2019). A panel of the Seventh Circuit held that this fetal-remains law was irrational, and thus unconstitutional, under the doctrine of "substantive due process." That decision was manifestly inconsistent with our precedent, as the Court holds.[1] I would have thought it could go without saying that nothing in the Constitution or any decision of this Court prevents a State from requiring

———————
[1] JUSTICE GINSBURG's dissent from this holding makes little sense. It is not a "'waste'" of our resources to summarily reverse an incorrect decision that created a Circuit split. *Post*, at 2. And JUSTICE GINSBURG does not even attempt to argue that the decision below was correct. Instead, she adopts Chief Judge Wood's alternative suggestion that regulating the disposition of an aborted child's body might impose an "undue burden" on the mother's right to abort that (already aborted) child. See *post*, at 1. This argument is difficult to understand, to say the least—which may explain why even respondent Planned Parenthood did not make it. The argument also lacks evidentiary support. See *Planned Parenthood of Indiana and Kentucky, Inc.* v. *Commissioner of Indiana State Dept. of Health*, 917 F. 3d 532, 538 (CA7 2018) (en banc) (Easterbrook, J., dissenting).

abortion facilities to provide for the respectful treatment of
human remains.

I write separately to address the other aspect of Indiana
law at issue here—the "Sex Selective and Disability Abor-
tion Ban." Ind. Code §16–34–4–1 *et seq.* This statute
makes it illegal for an abortion provider to perform an
abortion in Indiana when the provider knows that the
mother is seeking the abortion solely because of the child's
race, sex, diagnosis of Down syndrome, disability, or related
characteristics. §§16–34–4–1 to 16–34–4–8; see §16–34–
4–1(b) (excluding "lethal fetal anomal[ies]" from the defi-
nition of disability). The law requires that the mother be
advised of this restriction and given information about
financial assistance and adoption alternatives, but it
imposes liability only on the provider. See §§16–34–2–
1.1(a)(1)(K), (2)(A)–(C), 16–34–4–9. Each of the immuta-
ble characteristics protected by this law can be known
relatively early in a pregnancy, and the law prevents them
from becoming the sole criterion for deciding whether the
child will live or die. Put differently, this law and other
laws like it promote a State's compelling interest in pre-
venting abortion from becoming a tool of modern-day
eugenics.[2]

The use of abortion to achieve eugenic goals is not merely
hypothetical. The foundations for legalizing abortion in
America were laid during the early 20th-century birth-

_____

[2] See, *e.g.*, Ariz. Rev. Stat. Ann. §13–3603.02 (2018) (sex and race);
Ark. Code §20–16–1904 (2018) (sex); Kan. Stat. Ann. §65–6726 (2017)
(sex); La. Rev. Stat. Ann. §40:1061.1.2 (2019) (genetic abnormality);
N. C. Gen. Stat. §90–21.121 (2017) (sex); N. D. Cent. Code Ann. §14–
02.1–04.1 (2017) (sex and genetic abnormality); Ohio Rev. Code Ann.
§2919.10 (2018) (Down syndrome); Okla. Stat., Tit. 63, §1–731.2(B)
(2016) (sex); 18 Pa. Cons. Stat. §3204(c) (2015) (sex); S. D. Codified
Laws §34–23A–64 (2018) (sex). My focus on a State's compelling
interest in prohibiting eugenics in abortion does not suggest that States
lack other compelling interests in adopting these or other abortion-
related laws.

control movement. That movement developed alongside the American eugenics movement. And significantly, Planned Parenthood founder Margaret Sanger recognized the eugenic potential of her cause. She emphasized and embraced the notion that birth control "opens the way to the eugenist." Sanger, Birth Control and Racial Betterment, Birth Control Rev., Feb. 1919, p. 12 (Racial Betterment). As a means of reducing the "ever increasing, unceasingly spawning class of human beings who never should have been born at all," Sanger argued that "Birth Control . . . is really the greatest and most truly eugenic method" of "human generation." M. Sanger, Pivot of Civilization 187, 189 (1922) (Pivot of Civilization). In her view, birth control had been "accepted by the most clear thinking and far seeing of the Eugenists themselves as the most constructive and necessary of the means to racial health." *Id.*, at 189.

It is true that Sanger was not referring to abortion when she made these statements, at least not directly. She recognized a moral difference between "contraceptives" and other, more "extreme" ways for "women to limit their families," such as "the horrors of abortion and infanticide." M. Sanger, Woman and the New Race 25, 5 (1920) (Woman and the New Race). But Sanger's arguments about the eugenic value of birth control in securing "the elimination of the unfit," Racial Betterment 11, apply with even greater force to abortion, making it significantly more effective as a tool of eugenics. Whereas Sanger believed that birth control could prevent "unfit" people from reproducing, abortion can prevent them from being born in the first place. Many eugenicists therefore supported legalizing abortion, and abortion advocates—including future Planned Parenthood President Alan Guttmacher— endorsed the use of abortion for eugenic reasons. Technological advances have only heightened the eugenic potential for abortion, as abortion can now be used to eliminate

children with unwanted characteristics, such as a particular sex or disability.

Given the potential for abortion to become a tool of eugenic manipulation, the Court will soon need to confront the constitutionality of laws like Indiana's. But because further percolation may assist our review of this issue of first impression, I join the Court in declining to take up the issue now.

I

The term "eugenics" was coined in 1883 by Francis Galton, a British statistician and half-cousin of Charles Darwin. See S. Caron, Who Chooses?: American Reproductive History Since 1830, p. 49 (2008); A. Cohen, Imbeciles: The Supreme Court, American Eugenics, and the Sterilization of Carrie Buck 46 (2016) (Imbeciles). Galton described eugenics as "the science of improving stock" through "all influences that tend in however remote a degree to give to the more suitable races or strains of blood a better chance of prevailing speedily over the less suitable than they otherwise would have." F. Galton, Inquiries Into Human Faculty and Its Development 25, n. 1 (1883). Eugenics thus rests on the assumption that "man's natural abilities are derived by inheritance, under exactly the same limitations as are the form and physical features of the whole organic world." F. Galton, Hereditary Genius: An Inquiry Into Its Laws and Consequences 1 (1869) (Hereditary Genius); see Imbeciles 46–47. As a social theory, eugenics is rooted in social Darwinism—*i.e.*, the application of the "survival of the fittest" principle to human society. Caron, *supra*, at 49; Imbeciles 45. Galton argued that by promoting reproduction between people with desirable qualities and inhibiting reproduction of the unfit, man could improve society by "do[ing] providently, quickly, and kindly" "[w]hat Nature does blindly, slowly, and ruthlessly." F. Galton, Eugenics: Its Definition, Scope

and Aims, in Essays in Eugenics 42 (1909).

By the 1920s, eugenics had become a "full-fledged intellectual craze" in the United States, particularly among progressives, professionals, and intellectual elites. Imbeciles 2; see *id.*, at 2–4, 55–57; Cohen, Harvard's Eugenics Era, Harvard Magazine, pp. 48–52 (Mar.–Apr. 2016) (Harvard's Eugenics Era). Leaders in the eugenics movement held prominent positions at Harvard, Stanford, and Yale, among other schools, and eugenics was taught at 376 universities and colleges. Imbeciles 4; see also Harvard's Eugenics Era 48. Although eugenics was widely embraced, Harvard was "more central to American eugenics than any other university," with administrators, faculty members, and alumni "founding eugenics organizations, writing academic and popular eugenics articles, and lobbying government to enact eugenics laws." *Ibid.*; see *id.*, at 49–52. One Harvard faculty member even published a leading textbook on the subject through the Harvard University Press, Genetics and Eugenics. *Id.*, at 49.

Many eugenicists believed that the distinction between the fit and the unfit could be drawn along racial lines, a distinction they justified by pointing to anecdotal and statistical evidence of disparities between the races. Galton, for example, purported to show as a scientific matter that "the average intellectual standard of the negro race is some two grades below" that of the Anglo-Saxon, and that "the number among the negroes of those whom we should call half-witted men, is very large." Hereditary Genius 338–339. Other eugenicists similarly concluded that "the Negro . . . is in the large eugenically *inferior* to the white" based on "the relative achievements of the race" and statistical disparities in educational outcomes and life expectancy in North America, among other factors. P. Popenoe & R. Johnson, Applied Eugenics 285 (1920) (Applied Eugenics); see *id.*, at 280–297 (elaborating on this view); see also, *e.g.*, R. Gates, Heredity and Eugenics 234

(1923) (citing disparities between white and black people and concluding that "the negro's mental status is thus undoubtedly more primitive than that of the white man"); Hunt, Hand, Pettis, & Russell, Abstract, Family Stock Values in White-Negro Crosses: A Note on Miscegenation, 8 Eugenical News 67 (1923) ("Experiments, as well as general experience, indicate that the average inborn intelligence of the white man is considerably higher than that of the negro").

Building on similar assumptions, eugenicist Lothrop Stoddard argued that the "prodigious birth-rate" of the nonwhite races was bringing the world to a racial tipping point. L. Stoddard, The Rising Tide of Color Against White World-Supremacy 8–9 (1920). Stoddard feared that without "artificial barriers," the races "will increasingly mingle, and the inevitable result will be the supplanting or absorption of the higher by the lower types." *Id.*, at 302. Allowing the white race to be overtaken by inferior races, according to Stoddard, would be a tragedy of historic proportions:

> "[T]hat would mean that the race obviously endowed with the greatest creative ability, the race which had achieved most in the past and which gave the richer promise for the future, had passed away, carrying with it to the grave those potencies upon which the realization of man's highest hopes depends. A million years of human evolution might go uncrowned, and earth's supreme life-product, man, might never fulfil his potential destiny. This is why we today face 'The Crisis of the Ages.'" *Id.*, at 304.

Eugenic arguments like these helped precipitate the Immigration Act of 1924, which significantly reduced immigration from outside of Western and Northern Europe. §§11(a)–(b), 43 Stat. 159; Imbeciles 126–135; see also *id.*, at 135 (discussing the difficulties the Act created

for many Jews seeking to flee Nazism).  The perceived superiority of the white race also led to calls for race consciousness in marital and reproductive decisions, including through antimiscegenation laws.  Applied Eugenics 296 ("We hold that it is to the interests of the United States . . . to prevent further Negro-white amalgamation").

Although race was relevant, eugenicists did not define a person's "fitness" exclusively by race.  A typical list of dysgenic individuals would also include some combination of the "feeble-minded," "insane," "criminalistic," "deformed," "crippled," "epileptic," "inebriate," "diseased," "blind," "deaf," and "dependent (including orphans and paupers)."  Imbeciles 139; see Applied Eugenics 176–183; cf. G. Chesterton, Eugenics and Other Evils 61 (1922) ("[F]eeble-mindedness is a new phrase under which you might segregate anybody" because "this phrase conveys nothing fixed and outside opinion").  Immigration policy was insufficient to address these "danger[s] from within," Imbeciles 4, so eugenicists turned to other solutions. Many States adopted laws prohibiting marriages between certain feebleminded, epileptic, or other "unfit" individuals, but forced sterilization emerged as the preferred solution for many classes of dysgenic individuals.  *Id.*, at 63, 66.  Indiana enacted the first eugenic sterilization law in 1907, and a number of other States followed suit.  *Id.*, at 70.

This Court threw its prestige behind the eugenics movement in its 1927 decision upholding the constitutionality of Virginia's forced-sterilization law, *Buck* v. *Bell*, 274 U. S. 200.  The plaintiff, Carrie Buck, had been found to be "a feeble minded white woman" who was "the daughter of a feeble minded mother . . . and the mother of an illegitimate feeble minded child."  *Id.*, at 205.[3]  In an opinion

_____

[3] The finding that Buck was "feeble minded" was apparently wrong. See P. Lombardo, Three Generations, No Imbeciles: Eugenics, the

written by Justice Oliver Wendell Holmes, Jr., and joined by seven other Justices, the Court offered a full-throated defense of forced sterilization:

> "We have seen more than once that the public welfare may call upon the best citizens for their lives. It would be strange if it could not call upon those who already sap the strength of the State for these lesser sacrifices, often not felt to be such by those concerned, in order to prevent our being swamped with incompetence. It is better for all the world, if instead of waiting to execute degenerate offspring for crime, or to let them starve for their imbecility, society can prevent those who are manifestly unfit from continuing their kind. The principle that sustains compulsory vaccination is broad enough to cover cutting the Fallopian tubes. Three generations of imbeciles are enough." *Id.*, at 207 (citation omitted).

The Court's decision gave the eugenics movement added legitimacy and considerable momentum; by 1931, 28 of the Nation's 48 States had adopted eugenic sterilization laws. Imbeciles 299–300. Buck was one of more than 60,000 people who were involuntarily sterilized between 1907 and 1983. *Id.*, at 319.

Support for eugenics waned considerably by the 1940s as Americans became familiar with the eugenics of the Nazis and scientific literature undermined the assumptions on which the eugenics movement was built. But even today, the Court continues to attribute legal significance to the same types of racial-disparity evidence that were used to justify race-based eugenics. See T. Sowell, Discrimination and Disparities 5–6 (rev. ed. 2019) (Sow-

––––––––––

Supreme Court, and *Buck v. Bell* 277 (2008) (arguing that "the case was a sham"); see Imbeciles 15–35 (arguing that Buck had perfectly normal intelligence and no medical records of any disability).

ell).[4]  And support for the goal of reducing undesirable populations through selective reproduction has by no means vanished.

## II

This case highlights the fact that abortion is an act rife with the potential for eugenic manipulation.  From the beginning, birth control and abortion were promoted as means of effectuating eugenics.  Planned Parenthood founder Margaret Sanger was particularly open about the fact that birth control could be used for eugenic purposes.  These arguments about the eugenic potential for birth control apply with even greater force to abortion, which can be used to target specific children with unwanted characteristics.  Even after World War II, future Planned Parenthood President Alan Guttmacher and other abortion advocates endorsed abortion for eugenic reasons and promoted it as a means of controlling the population and improving its quality.  As explained below, a growing body

––––––––––

[4] Both eugenics and disparate-impact liability rely on the simplistic and often faulty assumption that "some one particular factor is the key or dominant factor behind differences in outcomes" and that one should expect "an even or random distribution of outcomes . . . in the absence of such complicating causes as genes or discrimination."  Sowell 25, 87. Among other pitfalls, these assumptions tend to collapse the distinction between correlation and causation and shift the analytical focus away from "flesh-and-blood human being[s]" to impersonal statistical groups frozen in time.  *Id.*, at 83; see *id.*, at 87–149 (explaining how statistics and linguistics can be used to obscure realities).  Just as we should not assume, based on bare statistical disparities, "that the Negro lacks in his germ-plasm excellence of some qualities which the white races possess," Applied Eugenics 285, "[w]e should not automatically presume that any institution with a neutral practice that happens to produce a racial disparity is guilty of discrimination until proved innocent." *Texas Dept. of Housing and Community Affairs* v. *Inclusive Communities Project, Inc.*, 576 U. S. \_\_\_, \_\_\_ (2015) (THOMAS, J., dissenting) (slip op., at 8).  Both views "ignore the complexities of human existence." *Id.*, at \_\_\_ (slip op., at 9).

of evidence suggests that eugenic goals are already being
realized through abortion.

### A

Like many elites of her day, Sanger accepted that eugenics was "the most adequate and thorough avenue to the
solution of racial, political and social problems." Sanger,
The Eugenic Value of Birth Control Propaganda, Birth
Control Rev., Oct. 1921, p. 5 (Propaganda). She agreed
with eugenicists that "the unbalance between the birth
rate of the 'unfit' and the 'fit'" was "the greatest present
menace to civilization." *Ibid.* Particularly "in a democracy
like that of the United States," where "[e]quality of political power has . . . been bestowed upon the lowest elements
of our population," Sanger worried that "reckless spawning carries with it the seeds of destruction." Pivot of Civilization 177–178.

Although Sanger believed that society was "indebted" to
"the Eugenists" for diagnosing these problems, she did not
believe that they had "show[n] much power in suggesting
practical and feasible remedies." *Id.*, at 178. "As an advocate of Birth Control," Sanger attempted to fill the gap by
showing that birth control had "eugenic and civilizational
value." Propaganda 5. In her view, birth-control advocates and eugenicists were "seeking a single end"—"to
assist the race toward the elimination of the unfit." Racial
Betterment 11. But Sanger believed that the focus should
be "upon stopping not only the reproduction of the unfit
but upon stopping *all* reproduction when there is not
economic means of providing proper care for those who are
born in health." *Ibid.* (emphasis added). Thus, for Sanger,
forced sterilization did "not go to the bottom of the matter"
because it did not "touc[h] the great problem of unlimited
reproduction" of "those great masses, who through economic pressure populate the slums and there produce in
their helplessness other helpless, diseased and incompe-

tent masses, who overwhelm all that eugenics can do among those whose economic condition is better." *Id.*, at 12. In Sanger's view, frequent reproduction among "the majority of wage workers" would lead to "the contributing of morons, feeble-minded, insane and various criminal types to the already tremendous social burden constituted by these unfit." *Ibid.*

Sanger believed that birth control was an important part of the solution to these societal ills. She explained, "Birth Control . . . is really the greatest and most truly eugenic method" of "human generation," "and its adoption as part of the program of Eugenics would immediately give a concrete and realistic power to that science." Pivot of Civilization 189. Sanger even argued that "eugenists and others who are laboring for racial betterment" could not "succeed" unless they "first clear[ed] the way for Birth Control." Racial Betterment 11. If "the masses" were given "practical education in Birth Control"—for which there was "almost universal demand"—then the "Eugenic educator" could use "Birth Control propaganda" to "direct a thorough education in Eugenics" and influence the reproductive decisions of the unfit. Propaganda 5. In this way, "the campaign for Birth Control [was] not merely of eugenic value, but [was] practically identical in ideal with the final aims of Eugenics." *Ibid.*

Sanger herself campaigned for birth control in black communities. In 1930, she opened a birth-control clinic in Harlem. See Birth Control or Race Control? Sanger and the Negro Project, Margaret Sanger Papers Project Newsletter #28 (2001), http://www.nyu.edu/projects/sanger/articles/bc_or_race_control.php (all Internet materials as last visited May 24, 2019). Then, in 1939, Sanger initiated the "Negro Project," an effort to promote birth control in poor, Southern black communities. *Ibid.* Noting that blacks were "'notoriously underprivileged and handicapped to a large measure by a "caste" system,'" she ar-

gued in a fundraising letter that "'birth control knowledge brought to this group, is the most direct, constructive aid that can be given them to improve their immediate situation.'" *Ibid.* In a report titled "Birth Control and the Negro," Sanger and her coauthors identified blacks as "'the great problem of the South'"—"the group with 'the greatest economic, health, and social problems'"—and developed a birth-control program geared toward this population. *Ibid.* She later emphasized that black ministers should be involved in the program, noting, "'We do not want word to go out that we want to exterminate the Negro population, and the minister is the man who can straighten out that idea if it ever occurs to any of their more rebellious members.'" *Ibid.*

Defenders of Sanger point out that W. E. B. DuBois and other black leaders supported the Negro Project and argue that her writings should not be read to imply a racial bias. *Ibid.*; see Planned Parenthood, Opposition Claims About Margaret Sanger (2016), https://www. plannedparenthood.org/uploads/filer_public/37/fd/37fdc7b6-de5f-4d22-8c05-9568268e92d8/sanger_opposition_claims_fact_sheet_2016.pdf. But Sanger's motives are immaterial to the point relevant here: that "Birth Control" has long been understood to "ope[n] the way to the eugenist." Racial Betterment 12.

B

To be sure, Sanger distinguished between birth control and abortion. Woman and the New Race 128–129; see, *e.g.*, Sanger, Birth Control or Abortion? Birth Control Rev., Dec. 1918, pp. 3–4. For Sanger, "[t]he one means health and happiness—a stronger, better race," while "[t]he other means disease, suffering, [and] death." Woman and the New Race 129. Sanger argued that "nothing short of contraceptives can put an end to the horrors of abortion and infanticide," *id.*, at 25, and she questioned

whether "we want the precious, tender qualities of womanhood, so much needed for our racial development, to perish in [the] sordid, abnormal experiences" of abortions, *id.*, at 29. In short, unlike contraceptives, Sanger regarded "the hundreds of thousands of abortions performed in America each year [as] a disgrace to civilization." *Id.*, at 126.

Although Sanger was undoubtedly correct in recognizing a moral difference between birth control and abortion, the eugenic arguments that she made in support of birth control apply with even greater force to abortion. Others were well aware that abortion could be used as a "metho[d] of eugenics," 6 H. Ellis, Studies in the Psychology of Sex 617 (1910), and they were enthusiastic about that possibility. Indeed, some eugenicists believed that abortion should be legal for the very *purpose* of promoting eugenics. See Harris, Abortion in Soviet Russia: Has the Time Come To Legalize It Elsewhere? 25 Eugenics Rev. 22 (1933) ("[W]e are being increasingly compelled to consider legalized abortion as well as birth control and sterilization as possible means of influencing the fitness and happiness and quality of the race"); Aims and Objects of the Eugenics Society, 26 Eugenics Rev. 135 (1934) ("The *Society* advocates the provision of legalized facilities for voluntarily terminating pregnancy in cases of persons for whom sterilization is regarded as appropriate"). Support for abortion can therefore be found throughout the literature on eugenics. *E.g.*, Population Control: Dr. Binnie Dunlop's Address to the Eugenics Society, 25 Eugenics Rev. 251 (1934) (lamenting "the relatively high birth-rate of the poorest third of the population" and "the serious rate of racial deterioration which it implied," and arguing that "this birth-rate . . . would fall rapidly if artificial abortion were made legal"); Williams, The Legalization of Medical Abortion, 56 Eugenics Rev. 24–25 (1964) ("I need hardly stress the eugenic argument for extending family planning"—

including "voluntary sterilization" and "abortion"—to "all groups, not merely to those who are the most intelligent and socially responsible").

Abortion advocates were sometimes candid about abortion's eugenic possibilities. In 1959, for example, Guttmacher explicitly endorsed eugenic reasons for abortion. A. Guttmacher, Babies by Choice or by Chance 186–188 (1959). He explained that "the quality of the parents must be taken into account," including "[f]eeblemindedness," and believed that "it should be permissible to abort any pregnancy . . . in which there is a strong probability of an abnormal or malformed infant." *Id.*, at 198. He added that the question whether to allow abortion must be "separated from emotional, moral and religious concepts" and "must have as its focus normal, healthy infants born into homes peopled with parents who have healthy bodies and minds." *Id.*, at 221. Similarly, legal scholar Glanville Williams wrote that he was open to the possibility of eugenic infanticide, at least in some situations, explaining that "an eugenic killing by a mother, exactly paralleled by the bitch that kills her misshapen puppies, cannot confidently be pronounced immoral." G. Williams, Sanctity of Life and the Criminal Law 20 (1957). The Court cited Williams' book for a different proposition in *Roe* v. *Wade*, 410 U. S. 113, 130, n. 9 (1973).

But public aversion to eugenics after World War II also led many to avoid explicit references to that term. The American Eugenics Society, for example, changed the name of its scholarly publication from "Eugenics Quarterly" to "Social Biology." See D. Paul, Controlling Human Heredity: 1865 to the Present, p. 125 (1995). In explaining the name change, the journal's editor stated that it had become evident that eugenic goals could be achieved "for reasons other than eugenics." *Ibid.* For example, "[b]irth control and abortion are turning out to be great eugenic advances of our time. If they had been advanced for eu-

genic reasons it would have retarded or stopped their acceptance." *Ibid.* But whether they used the term "eugenics" or not, abortion advocates echoed the arguments of early 20th-century eugenicists by describing abortion as a way to achieve "population control" and to improve the "quality" of the population. One journal declared that "abortion is the one mode of population limitation which has demonstrated the speedy impact which it can make upon a national problem." Notes of the Quarter: The Personal and the Universal, 53 Eugenics Rev. 186 (1962). Planned Parenthood's leaders echoed these themes. When exulting over "'fantastic . . . progress'" in expanding abortion, for example, Guttmacher stated that "'the realization of the population problem has been responsible' for the change in attitudes. 'We're now concerned more with the quality of population than the quantity.'" Abortion Reforms Termed "Fantastic," Hartford Courant, Mar. 21, 1970, p. 16.

Avoiding the word "eugenics" did not assuage everyone's fears. Some black groups saw "'family planning' as a euphemism for race genocide" and believed that "black people [were] taking the brunt of the 'planning'" under Planned Parenthood's "ghetto approach" to distributing its services. Dempsey, Dr. Guttmacher Is the Evangelist of Birth Control, N. Y. Times Magazine, Feb. 9, 1969, p. 82. "The Pittsburgh branch of the National Association for the Advancement of Colored People," for example, "criticized family planners as bent on trying to keep the Negro birth rate as low as possible." Kaplan, Abortion and Sterilization Win Support of Planned Parenthood, N. Y. Times, Nov. 14, 1968, p. L50, col. 1.

### C

Today, notwithstanding Sanger's views on abortion, respondent Planned Parenthood promotes both birth control and abortion as "reproductive health services" that

can be used for family planning.  Brief in Opposition 1.
And with today's prenatal screening tests and other tech-
nologies, abortion can easily be used to eliminate children
with unwanted characteristics.  Indeed, the individualized
nature of abortion gives it even more eugenic potential
than birth control, which simply reduces the chance of
conceiving *any* child.  As petitioners and several *amicus
curiae* briefs point out, moreover, abortion has proved to
be a disturbingly effective tool for implementing the dis-
criminatory preferences that undergird eugenics.  *E.g.*,
Pet. for Cert. 22–26; Brief for State of Wisconsin et al. as
*Amici Curiae* 19–25; Brief for Ethics and Religious Liberty
Commission of the Southern Baptist Convention et al. as
*Amici Curiae* 9–10.

In Iceland, the abortion rate for children diagnosed with
Down syndrome in utero approaches 100%.  See Will, The
Down Syndrome Genocide, Washington Post, Mar. 15,
2018, p. A23, col. 1.  Other European countries have simi-
larly high rates, and the rate in the United States is ap-
proximately two-thirds.  See *ibid.* (98% in Denmark, 90%
in the United Kingdom, 77% in France, and 67% in the
United States); see also Natoli, Ackerman, McDermott, &
Edwards, Prenatal Diagnosis of Down Syndrome: A Sys-
tematic Review of Termination Rates (1995–2011), 32
Prenatal Diagnosis 142 (2012) (reviewing U. S. studies).

In Asia, widespread sex-selective abortions have led to
as many as 160 million "missing" women—more than the
entire female population of the United States.  See M.
Hvistendahl, Unnatural Selection: Choosing Boys Over
Girls, and the Consequences of a World Full of Men 5–6
(2011); see also Kalantry, How To Fix India's Sex-
Selection Problem, N. Y. Times, Int'l ed., July 28, 2017,
p. 9 ("Over the course of several decades, 300,000 to
700,000 female fetuses were selectively aborted in India
each year.  Today there are about 50 million more men
than women in the country").  And recent evidence sug-

gests that sex-selective abortions of girls are common among certain populations in the United States as well. See Almond & Sun, Son-Biased Sex Ratios in 2010 U. S. Census and 2011–2013 U. S. Natality Data, 176 Soc. Sci. & Med. 21 (2017) (concluding that Chinese and Asian-Indian families in the United States "show a tendency to sex-select boys"); Almond & Edlund, Son-Biased Sex Ratios in the 2000 United States Census, 105 Proc. Nat. Acad. of Sci. 5681 (2008) (similar).

Eight decades after Sanger's "Negro Project," abortion in the United States is also marked by a considerable racial disparity. The reported nationwide abortion ratio—the number of abortions per 1,000 live births—among black women is nearly 3.5 times the ratio for white women. Dept. of Health and Human Services, Centers for Disease Control and Prevention, T. Jatlaoui et al., Abortion Surveillance—United States, 2015, 67 Morbidity and Mortality Weekly Report, Surveillance Summaries, No. SS–13, p. 35 (Nov. 23, 2018) (Table 13); see also Brief for Restoration Project et al. as *Amici Curiae* 5–6. And there are areas of New York City in which black children are more likely to be aborted than they are to be born alive—and are up to eight times more likely to be aborted than white children in the same area. See N. Y. Dept. of Health, Table 23: Induced Abortion and Abortion Ratios by Race/Ethnicity and Resident County New York State–2016, https://www.health.ny.gov/statistics/vital_statistics/2016/table23.htm. Whatever the reasons for these disparities, they suggest that, insofar as abortion is viewed as a method of "family planning," black people do indeed "tak[e] the brunt of the 'planning.'" Dempsey, *supra*, at 82.

Some believe that the United States is already experiencing the eugenic effects of abortion. According to one economist, "*Roe v. Wade* help[ed] trigger, a generation later, the greatest crime drop in recorded history." S.

Levitt & S. Dubner, Freakonomics 6 (2005); see *id.*, at 136–144 (elaborating on this theory). On this view, "it turns out that not all children are born equal" in terms of criminal propensity. *Id.*, at 6. And legalized abortion meant that the children of "poor, unmarried, and teenage mothers" who were "much more likely than average to become criminals" "weren't being born." *Ibid.* (emphasis deleted). Whether accurate or not, these observations echo the views articulated by the eugenicists and by Sanger decades earlier: "Birth Control of itself . . . will make a better race" and tend "toward the elimination of the unfit." Racial Betterment 11–12.

### III

It was against this background that Indiana's Legislature, on the 100th anniversary of its 1907 sterilization law, adopted a concurrent resolution formally "express[ing] its regret over Indiana's role in the eugenics movement in this country and the injustices done under eugenic laws." Ind. S. Res. 91, 115th Gen. Assemb., 1st Sess., §1 (2007); see Brief for Pro-Life Legal Defense Fund et al. as *Amici Curiae* 6–8. Recognizing that laws implementing eugenic goals "targeted the most vulnerable among us, including the poor and racial minorities, . . . for the claimed purpose of public health and the good of the people," Ind. S. Res. 91, at 2, the General Assembly "urge[d] the citizens of Indiana to become familiar with the history of the eugenics movement" and "repudiate the many laws passed in the name of eugenics and reject any such laws in the future," *id.*, §2.

In March 2016, the Indiana Legislature passed by wide margins the Sex-Selective and Disability Abortion Ban at issue here. Respondent Planned Parenthood promptly filed a lawsuit to block the law from going into effect, arguing that the Constitution categorically protects a woman's right to abort her child based solely on the child's

race, sex, or disability. The District Court agreed, granting a preliminary injunction on the eve of the law's effective date, followed by a permanent injunction. A panel of the Seventh Circuit affirmed. Pointing to *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833 (1992), both the District Court and the Seventh Circuit held that this Court had already decided the matter: "*Casey*'s holding that a woman has the right to terminate her pregnancy prior to viability is categorical." *Planned Parenthood of Indiana and Kentucky, Inc.* v. *Commissioner of Indiana State Dept. of Health*, 888 F. 3d 300, 305 (CA7 2018); see *Planned Parenthood of Indiana and Kentucky, Inc.* v. *Commissioner, Indiana State Dept. of Health*, 265 F. Supp. 3d 859, 866 (SD Ind. 2017). In an opinion dissenting from the denial of rehearing en banc, Judge Easterbrook expressed skepticism as to this holding, explaining that "*Casey* did not consider the validity of an anti-eugenics law" and that judicial opinions, unlike statutes, "resolve only the situations presented for decision." *Planned Parenthood of Indiana and Kentucky, Inc.* v. *Commissioner of Indiana State Dept. of Health*, 917 F. 3d 532, 536 (CA7 2018).

Judge Easterbrook was correct. Whatever else might be said about *Casey*, it did not decide whether the Constitution requires States to allow eugenic abortions. It addressed the constitutionality of only "five provisions of the Pennsylvania Abortion Control Act of 1982" that were said to burden the supposed constitutional right to an abortion. *Casey*, *supra*, at 844. None of those provisions prohibited abortions based solely on race, sex, or disability. In fact, the very first paragraph of the respondents' brief in *Casey* made it clear to the Court that Pennsylvania's prohibition on sex-selective abortions was "not [being] challenged," Brief for Respondents in *Planned Parenthood of Southeastern Pa.* v. *Casey*, O. T. 1991, Nos. 91–744, 91–902, p. 4. In light of the Court's denial of certiorari today, the consti-

tutionality of other laws like Indiana's thus remains an open question.

The Court's decision to allow further percolation should not be interpreted as agreement with the decisions below. Enshrining a constitutional right to an abortion based solely on the race, sex, or disability of an unborn child, as Planned Parenthood advocates, would constitutionalize the views of the 20th-century eugenics movement. In other contexts, the Court has been zealous in vindicating the rights of people even potentially subjected to race, sex, and disability discrimination. Cf. *Pena-Rodriguez* v. *Colorado*, 580 U. S. ___, ___ (2017) (slip op., at 15) (condemning "discrimination on the basis of race" as "'odious in all aspects'"); *United States* v. *Virginia*, 518 U. S. 515, 532 (1996) (denouncing any "law or official policy [that] denies to women, simply because they are women, . . . equal opportunity to aspire, achieve, participate in and contribute to society based on their individual talents and capacities"); *Tennessee* v. *Lane*, 541 U. S. 509, 522 (2004) (condemning "irrational disability discrimination").

Although the Court declines to wade into these issues today, we cannot avoid them forever. Having created the constitutional right to an abortion, this Court is dutybound to address its scope. In that regard, it is easy to understand why the District Court and the Seventh Circuit looked to *Casey* to resolve a question it did not address. Where else could they turn? The Constitution itself is silent on abortion.

With these observations, I join the opinion of the Court.

# SUPREME COURT OF THE UNITED STATES

KRISTINA BOX, COMMISSIONER, INDIANA DEPART-
MENT OF HEALTH, ET AL. *v.* PLANNED
PARENTHOOD OF INDIANA AND
KENTUCKY, INC., ET AL.

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED
STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

No. 18–483.   Decided May 28, 2019

JUSTICE GINSBURG, concurring in part and dissenting in part.

I agree with the Court's disposition of the second question presented. As to the first question, I would not summarily reverse a judgment when application of the proper standard would likely yield restoration of the judgment. In the District Court and on appeal to the Seventh Circuit, Planned Parenthood of Indiana and Kentucky urged that Indiana's law on the disposition of fetal remains should not pass even rational-basis review.[1] But as Chief Judge Wood observed, "rational basis" is not the proper review standard. *Planned Parenthood of Indiana and Kentucky, Inc.* v. *Commissioner of Indiana State Dept. of Health*, 917 F. 3d 532, 534 (CA7 2018) (opinion concurring in denial of rehearing en banc). This case implicates "the right of [a] woman to choose to have an abortion before viability and to obtain it without undue interference from the State,"

——————
[1] One may "wonder how, if respect for the humanity of fetal remains after a miscarriage or abortion is the [S]tate's goal, [Indiana's] statute rationally achieves that goal when it simultaneously allows any form of disposal whatsoever if the [woman] elects to handle the remains herself," *Planned Parenthood of Indiana and Kentucky, Inc.* v. *Commissioner of Indiana State Dept. of Health*, 917 F. 3d 532, 534 (CA7 2018) (Wood, C. J., concurring in denial of rehearing en banc), "and continues to allow for mass cremation of fetuses," *Planned Parenthood of Indiana and Kentucky, Inc.* v. *Commissioner of Indiana State Dept. of Health*, 888 F. 3d 300, 309 (CA7 2018) (case below).

*Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833, 846 (1992), so heightened review is in order, *Whole Woman's Health* v. *Hellerstedt*, 579 U. S. ___, ___ (2016) (slip op., at 20).

It is "a waste of th[e] [C]ourt's resources" to take up a case simply to say we are bound by a party's "strategic litigation choice" to invoke rational-basis review alone, but "everything might be different" under the close review instructed by the Court's precedent. 917 F. 3d, at 534, 535 (opinion of Wood, C. J.). I would therefore deny Indiana's petition in its entirety.[2]

––––––––––

[2] JUSTICE THOMAS' footnote, *ante,* at 1, n. 1, displays more heat than light. The note overlooks many things: "This Court reviews *judgments*, not statements in opinions," *California* v. *Rooney*, 483 U. S. 307, 311 (1987) (*per curiam*) (quoting *Black* v. *Cutter Laboratories*, 351 U. S. 292, 297 (1956); emphasis added); a woman who exercises her constitutionally protected right to terminate a pregnancy is not a "mother"; the cost of, and trauma potentially induced by, a post-procedure requirement may well constitute an undue burden, 917 F. 3d, at 534–535 (opinion of Wood, C. J.); under the rational-basis standard applied below, Planned Parenthood of Indiana and Kentucky had no need to marshal evidence that Indiana's law posed an undue burden, *id.,* at 535.